884 P.2d 1138

**ALLSTATE INSURANCE COMPANY, an Illinois corporation, Appellant,**

v.

**Brian HIROSE, Appellee.**

**No. 15745.**

Supreme Court of Hawai'i.

Oct. 20, 1994.

Richard B. Miller (William C. McCorriston, Lisa M. Ginoza and K. Rae McCorkle, with him on the briefs, of McCorriston, Miho & Miller), Honolulu, for appellant Allstate Ins. Co.

Bert S. Sakuda (of Cronin, Fried, Sekiya, Kekina & Fairbanks, and Thomas D. Collins, with him on the briefs), Honolulu, for appellee Brian Hirose.

Corlis J. Chang of Goodsill, Anderson, Quinn & Stifel, on the amicus brief, Honolulu, for amicus curiae Nat. Ass'n of Independent Insurers.

Before LUM, C.J.,* MOON, KLEIN and LEVINSON, JJ., and HEEN, Intermediate Court of Appeals Associate Judge assigned by reason of vacancy.

MOON, Chief Justice.**

Appellant Allstate Insurance Company (Allstate) filed a complaint for declaratory relief under federal diversity jurisdiction in the United States District Court for the District of Hawai'i (USDC). Allstate sought a declaration of its rights and responsibilities under its insurance policy, issued to James Hirose, concerning the combining of two or more coverage limits of underinsured motorist (UIM) benefits under a single policy [hereinafter, intra-policy stacking].[1]

Following motions for summary judgment, the USDC certified to this court the question whether the laws of the State of Hawai'i permit intra-policy stacking of multiple UIM coverage limits. We accepted certification and now answer the question in the affirmative.

## I. *BACKGROUND*

The underlying facts are not in dispute. On September 16, 1990, Brian Hirose was injured in an automobile accident with Kevin Kirk. Hirose settled with Kirk for the liability limits of Kirk's insurance policy in the amount of $35,000.

At the time of the accident, Hirose was operating a 1986 Nissan, which was owned by his father, James Hirose. Allstate insured the Nissan, along with a second vehicle, a 1989 Honda, under a single policy (the policy) issued to Hirose's father. Both vehicles carried UIM limits of $35,000 for each person and $70,000 for each accident. Allstate charged and Hirose's father paid separate premiums in identical amounts for the UIM coverages for each vehicle.

Because Hirose's damages exceeded the amount of the settlement with Kirk, Hirose sought UIM benefits under the policy. Allstate did not dispute that Hirose qualified as an insured under the policy and paid Hirose $35,000 in accordance with the limits for UIM benefits for the Nissan, the vehicle involved in the accident. However, Hirose sought to stack the policy's UIM benefits for both insured vehicles.

Allstate denied stacking based on (1) a general provision in the policy prohibiting the combining of limits of two or more vehicles and (2) a subsequent amendment to the policy, limiting Allstate's liability for UIM coverage (collectively, the anti-stacking provisions). The general policy provision provides:

**Combining Limits of Two or More Autos Prohibited**

Unless otherwise provided by law, the following provision will apply:

*If you have two or more autos insured in your name and one of these autos is involved in an accident, only the coverage limits shown on the declarations page for that auto will apply.* When you have two or more autos insured in your name and none of them is involved in an accident, you may choose any single auto shown on the declarations page and the coverage limits applicable to that auto will apply.

*The limits available for any other auto covered by the policy will not be added to the coverage for the involved or chosen auto.*

The Policy at 3–4 (emphasis added). The amendment to the policy contains a "limits of liability" provision, which provides in pertinent part:

4. These limits are the *maximum* Allstate will pay for Underinsured Motorists Insurance *for any one motor vehicle accident regardless of the number of:*

---

* Chief Justice Lum, who heard oral argument in this case, retired from the bench on March 31, 1993. *See* Hawai'i Revised Statutes (HRS) § 602–10.

** At the time this case was argued, Justice Moon was an associate justice of the supreme court. On March 31, 1993, he was sworn in as Chief Justice of the Supreme Court of Hawai'i.

1. Intra-policy stacking, that is, stacking of multiple stated policy limit coverages under one policy, differs from "inter-policy" stacking where multiple policy limit coverages under more than one policy are stacked.

(a) claims made;

(b) *vehicles* or persons *shown on the declarations page;* or

(c) vehicles involved in the accident.

Any amounts payable under this coverage will be excess to and will not duplicate amounts paid or payable under any Automobile Personal Injury Protection. No injured person may recover duplicate benefits for the same elements of loss under this or any other underinsured motorists insurance, including approved plans of self-insurance.

The Policy Amendment at 12 (emphasis added).

Allstate filed a complaint for declaratory relief on March 20, 1991, seeking a determination of its rights and responsibilities under the policy. Based on the anti-stacking provisions of the policy, Allstate maintained that it had no duty to pay Hirose more than one $35,000–limit in UIM benefits for his injuries arising out of the accident.

Hirose filed a motion for summary judgment, contending that the anti-stacking provisions of the policy are unenforceable because they violated Hawai'i's public policy and were contrary to the insured's expectations; therefore, he was entitled to the second $35,000 limit in UIM coverage. Allstate filed a cross motion for summary judgment essentially asserting that the anti-stacking provisions of the policy are valid under Hawai'i law.

Following oral arguments on the summary judgment motions, the USDC submitted the following certified question of law, which this court accepted:

Whether, in an automobile insurance policy issued pursuant to Hawaii Revised Statute [(HRS)] § 431:10C–301 (1988) and covering two vehicles owned by the named insured, a provision prohibiting "stacking" of multiple [UIM] coverage limits is unenforceable as contrary to Hawaii statutory law or public policy?

## II.  *DISCUSSION*

Allstate argues that this court should honor the unambiguous terms of the policy's anti-stacking provisions because the legislature chose to remain silent on the issue of stacking of UIM coverage limits. Hirose, on the other hand, essentially argues that, the UM statute also lacked express language allowing stacking of UM coverages, however, the legislative histories of the UM and UIM statutes support the case law that has allowed the practice of stacking UM coverages [2] and therefore should be similarly applied to this case. Allstate contends that our case law, which allows stacking of UM coverages, has been based on the existence of a stated statutory minimum for UM coverage. Allstate submits that the legislature's failure to include a statutory minimum for UIM coverage is the distinguishing factor that renders the UM stacking cases inapplicable here.

Our duty in interpreting statutes is to give effect to the legislature's intent which is obtained primarily from the language of the statute. *See Franks v. City and County of Honolulu,* 74 Haw. 328, 339, 843 P.2d 668, 673 (1993). However, we must construe statutory language in a manner consistent with the purpose of the statute. *Methven–Abreu v. The Hawaiian Ins. & Guaranty Co., Ltd.,* 73 Haw. 385, 392, 834 P.2d 279, 284, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992). Thus, where the statute is silent as to a claimed purpose of the statute we turn to the legislative history. *Franks,* 74 Haw. at 335, 843 P.2d at 671.

### A.  *The UIM Statute*

Our review of the language and the legislative history of the UIM statute does not reveal an express intent by the legislature to require, or ban, stacking of UIM benefits.[3] Rather, the legislature explicitly

2.  *See Walton v. State Farm Auto Ins.,* 55 Haw. 326, 518 P.2d 1399 (1974); *Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 575 P.2d 477 (1978); *American Ins. Co. v. Takahashi,* 59 Haw. 59, 575 P.2d 881, *reh'g denied,* 59 Haw. 102, 577 P.2d 780 (1978).

3.  We note that as of January 1, 1993, stacking of UM and UIM coverages is specifically prohibited unless the insured purchases a policy that contains a stacking option. *See* 1993 Haw.Sess.L., Act 123 at 209 (requiring insurers offer to its policyholders the option to purchase stacking or non-stacking policies).

left the issue of stacking to the judiciary, stating: "Judicial decisions on stacking of benefits are not affected by this bill, and it is your Committee's intent to leave the issue of stacking to judicial determination." Sen. Conf. Comm. Rep. No. 215, in 1988 Senate Journal, at 675. In accepting this task, we look to the legislative evolution of UIM insurance for guidance.

In 1985, the UM statute, HRS § 431–448 (1985) (originally enacted in 1965), was amended to include UIM coverage. The underscored language below reflects the amendments to HRS § 431–448:

**Automobile liability; coverage for damage by uninsured or underinsured motor vehicle.** (a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle, shall be delivered, issued for delivery, or renewed in this State, with respect to any motor vehicle registered or principally garaged in this State, unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7,[4] under provisions filed with and approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom, provided[, however,] that the coverage required under this section shall not [be applicable] apply where any insured named in the policy shall reject the coverage in writing.

(b) Each insurer shall offer to each policyholder or applicant for a motor vehicle liability policy optional additional insurance coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles.

(c) The term "underinsured motor vehicle," as used in this section, means a motor vehicle with respect to the ownership, maintenance, or use of which the sum of the limits of liability of all bodily injury liability insurance coverage applicable at the time of loss to which coverage afforded by such policy or policies applies is less than the liability for damages imposed by law. A motor vehicle shall also be deemed uninsured within the meaning of this section if, after the occurrence of a loss described in this section, the owner or operator thereof is unknown.

HRS § 431–448 (1985) (emphasis added) [hereinafter, the 1985 amendment].

In 1987, the legislature recodified and amended the UM statute as HRS § 431:10C–301, which provided:

**Required motor vehicle policy coverage.** (a) In order to meet the requirements of a no-fault policy as provided in this article, an insurance policy covering a motor vehicle shall provide:

(1) Coverage specified in section 431:10C–304; and

(2) Insurance to pay on behalf of the owner or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the named insured, sums which the owner or operator may legally be obligated to pay for injury, death, or damage to property of others, except property owned by, being transported by, or in the charge of the insured, which arise out of the ownership, operation, maintenance, or use of the motor vehicle.

(b) A motor vehicle insurance policy shall include:

(1) Liability coverage of not less than $35,000 for all damages arising out of accidental harm sustained by any one person as a result of any one accident applicable to each person sustaining accidental harm arising out of ownership,

---

**4.** HRS § 287–7 required that "[every automobile liability policy or bond] is subject to a limit, exclusive of interest and costs, of not less than the liability coverages stated in Section 294– 10(a)." HRS § 294–10(a) required "[l]iability coverage of not less than $35,000 for all damages arising out of accidental harm sustained by any one person as a result of any one accident[.]"

maintenance, use, loading, or unloading of the insured vehicle;

(2) Liability coverage of not less than $10,000 for all damages arising out of injury to or destruction of property including motor vehicles and including the loss of use thereof, but not including property owned by, being transported by, or in the charge of the insured, as a result of any one accident arising out of ownership, maintenance, use, loading, or unloading, of the insured vehicle; and

(3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7, under provisions filed with and approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage in writing.

HRS § 431:10C–301 (Spec.Pamphlet 1987).

HRS § 431:10C–301(b) was then amended in 1988, adding the following UIM provision, which is applicable to the present case:

(4) Coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles. An insurer may offer the underinsured motorist coverage required by this paragraph in the same manner as uninsured motorist coverage; provided that such offer of both shall:
(A) Be conspicuously displayed so as to be readily noticeable by the insured;
(B) Set forth the premium for the coverage adjacent to the offer in such a manner that the premium is clearly identifiable with the offer and may be easily subtracted from the total premium to

determine the premium payment due in the event the insured elects not to purchase the option; and

(C) Provide for written rejection of the coverage by requiring the insured to affix the insured's signature in a location adjacent to or directly below the offer.

HRS § 431:10C–301(b)(4) (Supp.1991)[5] [hereinafter, the 1988 amendment].

The legislative history of the 1988 amendment indicates that UM and UIM shared the same purpose, that is, "to require insurers to offer coverage for underinsured motor vehicles in motor vehicle insurance policies." Hse. Stand. Comm. Rep. No. 1150–88, in 1988 House Journal, at 1248. The legislature specifically intended that UM and UIM be treated alike:

Under this bill, [UIM] coverage would be *treated in the same manner that [UM] coverage is presently treated,* i.e. as a means of protection, through voluntary insurance, for persons who are injured by motorists whose liability policies are inadequate to pay for personal injuries.

Sen. Conf. Comm. Rep. No. 215, in 1988 Senate Journal, at 675 (emphasis added); *see also* Hse. Stand. Comm. Rep. No. 1150–88, in 1988 House Journal, at 1248 and Hse. Stand. Comm. Rep. No. 126–88, in 1988 House Journal, at 826.

In light of the legislature's express intent that UIM coverage be treated in the same manner as UM coverage, we deem it pertinent to examine the treatment of stacking of UM benefits in this jurisdiction.

### B. *Stacking of UM Coverages*

Although the statutory language of HRS § 431–448 was silent as to stacking of UM coverage, this court has interpreted the statute as permitting the stacking of UM benefits in *Walton v. State Farm Auto Ins.,* 55 Haw. 326, 518 P.2d 1399 (1974); *Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 575 P.2d 477 (1978); and *American Ins. Co. v. Takahashi,*

---

5.  HRS § 431:10C–301(b)(4) became effective six months after its approval date of June 13, 1988.

*See* 1988 Haw.Sess.L., Act 306, § 1, 575, 576.

59 Haw. 59, 575 P.2d 881, *reh'g denied,* 59 Haw. 102, 577 P.2d 780 (1978).

In *Walton,* the plaintiff-insured John Walton was injured in an automobile accident while riding as a passenger in a vehicle owned by Gary Seto (the host driver). The driver of the other vehicle involved in the accident was uninsured. Walton recovered the maximum amount of UM coverage ($10,-000) from the host driver's policy. Although Walton obtained a $25,000 judgment against the uninsured motorist, Walton was unable to collect the judgment because the uninsured motorist had voluntarily filed bankruptcy. *Walton,* 55 Haw. at 326–27, 518 P.2d at 1399–1400.

Walton then presented his claim for $10,-000 to his own insurer, State Farm Mutual Insurance Company (State Farm). State Farm argued that, in accordance with a policy provision, because Walton was injured in a vehicle it did not insure, the UM provision applied only in excess over any other similar insurance available to Walton.[6] In other words, because Walton had already collected $10,000 from Seto's insurance and, because Walton's UM coverage was also limited to $10,000, there was no "excess" over the "other insurance" (Seto's UM coverage); therefore, State Farm took the position that there could be no recovery against Walton's own insurer.

We invalidated the "other insurance" policy provision providing only excess insurance over any other of the insured's applicable coverage and adopted the majority rule from other jurisdictions that "state statutory provisions ... must be interpreted as invalidating clauses in insurance policies that, if effectuated, would reduce the benefits directly payable by the injured-insured's insurer to a *sum below the statutory minimum." Id.* at 328–29, 518 P.2d at 1401 (emphasis added). At that time, the statutory minimum in Hawai'i, incorporated by reference into the UM

statute, HRS § 431–448, was "not less than $10,000" for bodily injury to one person in any one accident.

In *Morgan,* the plaintiff, while operating a vehicle she did not own, was injured as the result of an automobile accident with an uninsured motorist. *Morgan,* 59 Haw. at 45–46, 575 P.2d at 478. The plaintiff's father owned three vehicles, all insured under a single automobile policy issued by Allstate, and he paid separate premiums for each vehicle. The plaintiff, as a member of her father's household, sought to obtain and stack $10,000 in UM coverages for each vehicle insured under the policy, amounting to $30,000. *Id.* at 46, 575 P.2d at 479. In ruling on the declaratory action filed by Allstate, the circuit court determined that the terms of the policy at issue should be construed to permit stacking of UM coverage. Allstate appealed.

On appeal, we determined that "the phrase 'with respect to any motor vehicle' indicates that separate [UM] coverage, in at least the minimum statutorily required amounts, must be provided for *each* automobile insured under a policy of liability insurance." *Id.* at 48–49, 575 P.2d at 480 (emphasis added). We therefore allowed the intra-policy stacking of UM coverages, notwithstanding the fact that none of the insured vehicles were involved in the accident.

In *Takahashi,* we examined a similar issue as that raised in *Morgan,* that is, whether the insureds under American Insurance Company's (American) policy covering two automobiles were entitled to recover UM benefits of $20,000, the statutory minimum coverage on one automobile per accident, or $40,000 (the combined limits on both automobiles per accident), when the insureds were injured while traveling in a third, independently owned and insured automobile. The circuit court determined that the insureds were entitled to receive UM benefits, but

---

**6.** The applicable State Farm policy provision provided:

Under [the uninsured motorist provisions of the policy] with respect to *bodily injury* to an *insured* while *occupying* a motor vehicle not owned by a named insured under this coverage, the insurance hereunder shall apply only as excess insurance over any other similar

insurance available to such occupant, and this insurance shall then apply only in the amount by which the applicable limit of liability of this coverage exceeds the sum of the applicable limits of liability of all such other insurance. *Walton,* 55 Haw. at 327 n. 1, 518 P.2d at 1400, n. 1 (emphasis in original).

held American liable for the maximum limit on one automobile per accident, and not both automobiles.

On appeal, we determined that the limits of liability clause [7] in American's policy was inconsistent with our decision in *Morgan* and held that the "coverage applie[d] separately but fully to both automobiles insured under the policy," *Takahashi*, 59 Haw. at 63–64, 575 P.2d at 883–84, stating once again that the insurer "cannot reduce its liability for [UM] coverage below the statutory required minimum amounts for each uninsured vehicle." 59 Haw. at 64, 575 P.2d at 884 (citation omitted).

Thus, although the UM statute did not expressly permit stacking, this court has held consistently that the language of the statute requiring minimum coverage for each insured motor vehicle provides the basis for stacking of UM coverages. Further, it is undisputed that, as a result of the aforementioned cases, the practice of stacking UM coverages has continued throughout and beyond the relevant period in this case.

### C. *Stacking of UIM Coverages*

As previously noted, Allstate contends that our case law allowing stacking of UM coverages has been based on the existence of a stated statutory minimum for UM coverage. Pointing to the 1985 amendment, Allstate focuses on the language "in limits for bodily injury or death set forth in section 287-7" and "with respect to any motor vehicle" in subsection (a), dealing with UM coverage, which phrases are conspicuously absent from subsections (b) and (c), dealing with UIM coverage. Consequently, Allstate maintains that the distinguishing factor that renders the UM stacking cases inapplicable to the case at bar is the legislature's failure to include a statutory minimum for UIM coverage.

Hirose, on the other hand, argues that because this court held in *Mollena v. Fireman's Fund Insurance Co.*, 72 Haw. 314, 816 P.2d 968 (1991), "that the statutory minimum amount that insurers must offer for UIM coverage was the same as for UM," this court's basis for allowing stacking in UM cases should be applied to UIM cases. Allstate, however, maintains that "the *Mollena* opinion is devoid of any suggestion that UM and UIM coverages are identical or that the coverage requirements of one necessarily appl[ies] to the other." We disagree.

In *Mollena*, Fireman's Fund Insurance Company (Fireman's), in accordance with HRS § 431–448(b), forwarded a letter to its policyholders in early 1986 purporting to offer optional UIM coverage. Fireman's offer letter stated, in part, "underinsured/uninsured motorist coverage $35,000 limit." Appellants Mollena and Costa, Fireman's policyholders, were each injured in separate automobile accidents in late 1986 and 1987. Both recovered liability policy limits of $35,000 each from the third-party tortfeasor involved in their respective accidents, and both sought UIM benefits from Fireman's; however, their claims were denied on the basis that their respective policies did not include UIM coverage. Although Mollena and Costa alleged that they had never received Fireman's offer letter, they contended that the letter was not a legally sufficient offer under HRS § 431–448 and, therefore, UIM coverage must be implied as a matter of law. The primary issue on appeal was whether, based on the language of section 431–448, written rejection of UIM coverage by Fireman's policyholders was required to relieve an insurer from providing such coverage. In our analysis, we explained:

> HRS § 431–448 is divided into three subsections: subsection (a) *relates to uninsured motorist coverage, the offer of coverage [in the minimum amount of $35,000], and written rejection;* and subsections (b)

---

7. The limits of liability clause involved in *Takahashi* provided:

> Regardless of the number of ... (4) automobiles or trailers to which this policy applies,
>
> . . . .
>
> (C) the limit for Uninsured Motorists Coverage stated in the declarations as applicable to

"each accident" is the total limit of the company's liability for all damages because of bodily injury sustained by one or more persons as the result of any one accident.

*Takahashi*, 59 Haw. at 63 n. 5, 575 P.2d at 883 n. 5.

and (c) relate to underinsured motorist coverage. The phrase "under this section" and "as used in this section" in HRS § 431–448(a) and (c), respectively, illustrate the fact that subsections (a) and (c) apply to the entire section (or statute), and not just within their respective subsections. As Costa notes, if the word "section" were replaced with "subsection," HRS § 431–448 would be meaningless. Further, the legislature carefully distinguished between the use of "section" and "subsection" in Act 181. As a part of Act 181, HRS § 431–448 was amended to add underinsured motorist coverage. *See* Act 181, §§ 1–8, 1985 Haw.Sess.Laws 309–313. We conclude, therefore, that HRS § 431–448(a) which requires written rejection of uninsured coverage also applies to offers of underinsured motorist coverage described in HRS § 431–448(b) and (c).

*Id.* at 323–24, 816 P.2d at 973.

We also noted that in *State Farm Mutual Automobile Insurance Co. v. Robinol,* 699 F.Supp. 819 (D.Haw.1988), the United States District Court for the District of Hawaii held the phrase "shall be delivered, issued for delivery, or renewed," found only in subsection (a), also applied to subsections (b) and (c), that is, that offers of UM coverage must be made when the policy is delivered, issued for delivery, or renewed. *Mollena,* 72 Haw. at 324, 816 P.2d at 973. We adopted the *Robinol* court's reasoning that "[because] the underinsured provisions were made a part of the statute which contained offer of coverage provisions, the legislature intended that pre-existing language be applied to underinsured motorist coverage as well." *Id.* (citation omitted). We declared that "[i]t is clear that HRS § 431–448(b) and (c) should be read in conjunction with HRS § 431–448(a)." *Id.*

Because we determined that "HRS § 431–448(b) and (c) should be read in conjunction with HRS § 431–448(a)," *id.,* and because subsection (a) required minimum UM coverage "with respect to any motor vehicle"—the statutory language this court relied on in holding that stacking of UM coverage was allowed in *Walton, Morgan,* and *Takahashi*—we held that the required offer of UIM

coverage to Mollena and Costa, pursuant to HRS § 431–448, was the statutory minimum of $35,000 each. *Mollena,* 72 Haw. at 326, 816 P.2d at 974.

In so holding, we specifically stated that "Mollena and Costa are entitled, as a matter of law, to implied offers in the minimum amount to be offered for uninsured motorist coverage as required under HRS §§ 287–7, 294–10(a), and 431–448,[8] which in this case amounts to $35,000 each to Mollena and Costa." *Id.*

Allstate essentially argues that this court's determination of the amount of $35,000 was purely as a result of the fact that the amount was consistent with Fireman's legally insufficient offer of $35,000 and had no bearing on the statutory minimum of $35,000 required to be offered for UM coverage. We believe that Allstate's position is untenable because it disregards this court's construction, in *pari materia,* of the interrelated subsections of HRS § 431–448, as well as our holding, which specifically incorporated HRS §§ 287–7 and 294–10(a).

Based on *Mollena,* we must read HRS §§ 431:10C–301(b)(3) and (b)(4) in conjunction with each other when construing the various subsections of the statute. In so doing, we reach the same conclusion as we did in *Mollena* that the UM and UIM provisions in subsections (b)(3) and (b)(4) are also interrelated and overlapping. For example, we note that under the UIM provision, subsection (b)(4) states that UIM may be offered in the same manner as UM "provided that such offer of *both* shall" comply with subsections (b)(4)(A), (B), and (C). We further note that subsection (b)(3) of the UM provision refers to the requirement that rejection of UM coverage by the insured must be in writing, while subsection (b)(4)(C) reiterates the identical requirement of written rejection of UIM coverage. Whether the overlapping was "intentional" or coincidental, it confirms the legislative intent that both coverages be treated alike and that the subsections be read in conjunction with each other.

8. *See supra* note 4.

Given the legislature's expressed intent that UIM and UM coverages be treated alike, we assume that in promulgating the 1988 amendment, the legislature was then aware of the "present" treatment of UM coverage, that is, that this court, since 1974, had consistently ruled in favor of stacking UM coverage, commencing with *Walton.* See *Marsland v. Pang,* 5 Haw.App. 463, 485, 701 P.2d 175, 192, *cert. denied,* 67 Haw. 686, 744 P.2d 781 (1985) ("we must ... assume that the legislature was aware of the state of the law ... at [the time it legislated]"). Moreover, Allstate concedes that it, like other insurance companies, routinely allowed UIM stacking after the adoption of the initial UIM statute in 1985 and continued this practice through the 1988 legislative session.

Our review of the 1988 legislative history confirms the correctness of our assumption that the legislature was aware of the ongoing practice of stacking UM coverage. The legislative history also reveals that the legislature considered proposals to prohibit the practice of stacking not only UM but UIM coverage, which reasonably implies that the legislature was also aware of the ongoing practice of stacking UIM coverages as well:

The DCCA [Department of Commerce and Consumer Affairs] testimony further stated that the case law does not allow carte blanche stacking of uninsured/underinsured motorist coverages; rather, the Supreme Court has established very explicit guidelines limiting recovery to only those seriously injured claimants who would fail to receive fair compensation in the absence of stacking.

Your Committee, upon consideration of DCCA testimony, has amended this bill by deleting the proposed new Subsection (d).

Sen. Stand. Comm. Rep. No. 2062, in 1988 Senate Journal, at 892.

Notwithstanding proposals to ban stacking of UM/UIM coverages, the 1988 legislature, as previously noted, "[left] the issue of stacking to judicial determination." Sen. Conf. Comm. Rep. No. 215, in 1988 Senate Journal, at 675. Nevertheless, in November 1989, Allstate issued its policy amendment precluding UIM stacking and readjusted its premium to reflect anti-UIM stacking because it

believed that the legislature did not intend to require stacking of UIM coverage. Allstate explains that the reason it permitted UIM stacking under its pre–1989 amendment policy was because its pre-November 1989 provision "was admittedly ambiguous as to stacking."

■ Allstate also contends that the legislative history establishes that Hawaiʻi's legislature did not intend to require stacking of UIM benefits because, with regard to the original (1985) version of the UIM statute, the legislature had considered setting statutory minimum limits for UIM coverage, but specifically chose not to do so. Allstate argues that the legislature intended the insurers and their policyholders to agree on the amount of UIM coverage. In support, Allstate cites to the following:

Testimony on the "underinsured" coverage provision indicated that such optional coverage would provide additional protection to the injured party. Since the intent of the no-fault law is to provide speedy and adequate protection to the injured party at the least possible cost, your Committee is in favor of the underinsured coverage. The coverage being optional, however, your Committee believes that the coverage amounts of $125,000 and $150,000 should not be stated in the law but should be a matter between the insurance company and the insured.

Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181. We disagree with Allstate's interpretation of the legislative history.

Indeed, the 1985 legislature received proposals to set the minimum UIM coverages at $125,000 and $150,000. We believe, however, that by rejecting these proposals and indicating that such substantial amounts "should be a matter between the insurance company and the insured," *id.,* the legislature did not intend to imply that there was no minimum UIM coverage and that any amount of such coverage would be left to negotiations between the parties. Allstate's reading of the legislative history, as it relates to the interpretation of the 1985 UIM statute, would produce absurd and unjust results and dis-

tort the intent and purpose of UIM protection if the amount of UIM coverage were left to the insurance companies and its policyholders. Statutes should be interpreted according to the intent, meaning, and purpose of the overall statutory scheme and not in a manner that would lead to absurd and unjust results. *Franks v. City and County of Honolulu,* 74 Haw. 328, 334–35, 341, 843 P.2d 668, 671, 674 (1993); *see also Methven–Abreu v. Hawaiian Ins. & Guar. Co.,* 73 Haw. 385, 834 P.2d 279, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); *Schmidt v. Board of Dir. of Ass'n of Apartment Owners of Marco Polo,* 73 Haw. 526, 836 P.2d 479 (1992).

"[I]nsurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys[.]" *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960, 964 (1984). Because such contracts of adhesion reflect the unequal bargaining power between an insurer and its policyholders, we cannot take seriously Allstate's suggestion that the legislature intended such parties to negotiate the amount of UIM coverage.

> Traditional contract law was designed for a paradigmatic agreement that had been reached by two parties of equal bargaining power by a process of free negotiation. Today, however, in routine transactions the typical agreement consists of a standard printed form that has been prepared by one party and assented to by the other with little or no opportunity for negotiation. Commonplace examples include purchase orders for automobiles, credit card agreements, and insurance policies....
>
> ....
>
> Dangers are inherent in standardization, however, for it affords a means by which one party may impose terms on another unwitting or even unwilling party. Two circumstances facilitate this imposition. First, while the party that proffers the form has had the advantage of time and expert advice in preparing it, the other party is usually completely or at least relatively unfamiliar with its terms. That party may have no real opportunity to read the form, and is often not expected to do so. The opportunity to read it may be diminished by the use of fine print and convoluted clauses. Second, bargaining over terms may not be between equals or, as is more often the case, there may be no opportunity to bargain at all. The standard form may be used by an enterprise with such disproportionately strong economic power that it simply dictates the terms. Or the form may be a take-it-or-leave-it proposition, often called a *contract of adhesion,* under which the only alternative to complete adherence is outright rejection. It would, indeed, defeat the purpose of standardization if the other party were free to negotiate over its terms.

E. Allan Farnsworth, Contracts, § 4.26, at 310–12 (2d ed. 1990).

Thus, it would be absurd to believe that the legislature intended an insurer would be able to comply with a statutory obligation to offer UIM optional coverage unless there were at least some minimum requisite amount. *See Mollena, supra.* To hold otherwise would allow insurers to offer UIM coverage in such minimal amounts that the purpose and intent of protecting the victims injured by financially irresponsible motorists would be undermined.

### III. *CONCLUSION*

Based on the foregoing, we hold that the statutory minimum of UIM coverage was $35,000 at the time of the accident and, under the circumstances of this case, UIM coverage, as with UM coverage, was also subject to stacking.