80 P.3d 1002

**DAI–TOKYO ROYAL STATE INSUR-
ANCE COMPANY, LIMITED,
Plaintiff–Appellee,**

v.

**Lester YOKOTE and Debbie Yokote,
Defendants–Appellants.**

No. 24799.

Intermediate Court of Appeals of Hawai'i.

Oct. 31, 2003.

As Amended Nov. 14, 2003.

Certiorari Denied Dec. 26, 2003.

Roy K.S. Chang, Harvey M. Demetrako-
poulos (Shim & Chang), Honolulu, on the
briefs, for defendants-appellants.

J. Patrick Gallagher, Leah M. Reyes
(Henderson Gallagher & Kane), on the
briefs, for plaintiff-appellee.

BURNS, C.J., and LIM, J.; and FOLEY,
J., Dissenting.

Opinion of the Court by LIM, J.

Lester Yokote (Lester) and Debbie Yokote
(Debbie) (collectively,. the Yokotes) appeal
the amended final judgment of the circuit
court of the first circuit, entered in favor of
Dai–Tokyo Royal State Insurance Company,
Limited (DTRIC), and the underlying
amended order of even date that granted
DTRIC's motion for summary judgment.

We conclude the circuit court was wrong in
granting DTRIC's motion for summary judg-
ment. We hold that the Yokotes may
"stack" the wage loss coverage from their
respective DTRIC auto insurance policies
atop the wage loss benefits paid them under
other applicable auto insurance policies.
DTRIC's "Non–Duplication of Benefits"
clause, which purports to limit wage loss
benefits of the two DTRIC policies, is invalid
to the extent it impairs coverage of actual
wage loss. We therefore vacate the circuit

court's amended order, which concluded to the contrary, along with the amended judgment recumbent thereon, and remand.

## I. Factual Background.

This case arises out of two traffic accidents, one involving Lester on, September 16, 2000, and the other involving Debbie on September 9, 1998. Lester and Debbie both sought, but were denied, certain wage loss benefits under their respective but identical DTRIC auto insurance form policies. The following facts, which were either admitted or undisputed below, were before the court on summary judgment.

### A. Lester's Auto Accident and Its Sequelae.

On September 16, 2000, Lester was driving a 2000 Mazda MPV van, which he owned and insured as a named insured with First Fire and Casualty Insurance of Hawai'i (First Insurance), when he was involved in an accident. Lester suffered disabling and possibly permanent injuries, resulting in wage loss. Lester's First Insurance auto insurance policy contained wage loss coverage of $2,000 a month with an aggregate limit of $12,000. At the time of the accident, Lester was also a named insured under a DTRIC auto insurance policy, which afforded wage loss coverage of $4,000 a month with an aggregate limit of $24,000.

According to Lester's affidavit, First Insurance did not offer any higher optional wage loss coverage. On the advice of his insurance agent, Lester did not cancel coverage of the DTRIC policy, which insured several motor vehicles of the Yokote household, on the van he had traded in to purchase the 2000 Mazda MPV van. He was told that DTRIC's wage loss coverage would apply to the new van, and sure enough, the new van was included under Lester's DTRIC policy in due course, as a replacement vehicle. Lester continued to pay DTRIC the $46 annual premium attributable to the 2000 Mazda MPV van for optional wage loss coverage, in order to maximize his optional wage loss coverage. At the time of the accident, Lester earned $3,511 a month, or roughly $42,000 a year.

First Insurance paid Lester $2,000 a month, up to its aggregate policy limit of $12,000. Lester sought additional wage loss benefits under his DTRIC policy. DTRIC refused to pay Lester more in wage loss benefits than its aggregate policy limit exceeded that of First Insurance's aggregate policy limit ($24,000 − $12,000 = $12,000). Lester, on the other hand, seeks to "stack" the aggregate limits of the two policies ($12,000 + $24,000 = $36,000) to cover his actual wage loss.

### B. Debbie's Auto Accident and Its Sequelae.

On September 9, 1998, Debbie was driving a 1989 Toyota Camry when she was involved in an accident. Debbie sustained injuries and underwent surgery. As a result, Debbie could not work at all or only part-time for roughly nine months.

At the time of the accident, Debbie was living with her husband Lester and their daughter, and her father-in-law. According to Debbie's affidavit, she was the primary driver of the 1989 Toyota Camry, which was owned by her father-in-law and insured under an auto insurance policy issued to him and her husband by State Farm Mutual Automobile Insurance Company (State Farm). For a premium of $50 every six months, State Farm provided wage loss coverage of $2,500 per month, $15,000 in the aggregate. State Farm paid Debbie $2,500 a month in wage loss benefits, which left her with a shortfall of $730 a month on her $3,230 monthly salary. At the time of the accident, Debbie was a named insured along with her husband under a DTRIC auto insurance policy on their motor vehicles, which provided wage loss coverage of $1,500 per month, no aggregate limit, for an annual premium of $50 to $60 per vehicle. DTRIC refused Debbie's request for wage loss benefits under its policy because its policy limits purportedly did not exceed those of the State Farm policy.

### C. DTRIC's "Non–Duplication of Benefits" Clause.

The respective DTRIC policies were identical form policies. The endorsement pertaining to optional benefits coverage, in-

cluding wage loss coverage,[1] contained the following clause:

**NON–DUPLICATION OF BENEFITS**

No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and:

1. Part **A** or Part **C**[2] of this policy;

2. Any Personal Injury Protection Coverage provided by this policy; or

3. Any Underinsured Motorists Coverage provided by this policy.

If an "insured" is entitled to similar benefits under more than one policy, the maximum recovery under all policies will not exceed the amount payable under the policy with the highest dollar limit of benefits. If there is other applicable similar insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits.

(Bold typesetting in the original; footnote added.)

## II. Procedural Background.

On May 11, 2001, DTRIC filed a complaint for declaratory judgment, praying that the circuit court declare:

A. That Plaintiff DTRIC is not required to provide any additional optional wage loss benefits to Defendant LESTER YOKOTE under the 2000 DTRIC policy as DTRIC has already paid to the extent its respective limits exceed those of the primary policy.

B. That Plaintiff DTRIC is not obligated to provide additional optional wage loss benefits to Defendant DEBBIE YOKOTE under the 1998 DTRIC policy as DTRIC's policy limits do not exceed those of the State Farm policy.

C. That the court otherwise decide and determine the respective rights, duties and obligations of the parties under the 1998 DTRIC policy and 2000 DTRIC policy.

DTRIC also prayed for an award of its attorney fees and costs.

On July 12, 2001, DTRIC filed a motion for summary judgment. In its motion, DTRIC asserted that the Yokotes were improperly attempting to "stack" optional wage loss benefits. For this assertion, DTRIC cited *Rana v. Bishop Ins. of Hawaii, Inc.*, 6 Haw.App. 1, 713 P.2d 1363 (1985), and *Nat'l Union Fire Ins. Co. v. Villanueva*, 716 F.Supp. 450 (D.Haw.1989), as controlling authorities. DTRIC also cited *Yamaguchi v. State Farm Mut. Auto. Ins. Co.*, 706 F.2d 940 (9th Cir. 1983), as the controlling authority validating its "Non–Duplication of Benefits" clause.

The circuit court[3] granted summary judgment in favor of DTRIC, and thereupon found and declared as follows:

THE COURT HEREBY FINDS THAT:

Stacking of wage loss benefits is not permissible under [*Rana*] and [*Villanueva*] and not specifically allowed under [Hawai'i Revised Statutes (HRS) chapter] 431:10C. Further, the language of the insurance policies at issue is clear and unambiguous and apply only as excess to the extent their respective aggregate limits exceed those of the primary policies.

ACCORDINGLY, THE COURT ORDERS:

1. DTRIC's obligation to pay optional wage loss benefits to LESTER YOKOTE

1. The endorsement affording optional benefits coverage, including wage loss coverage, provided that wage loss consists of,

Monthly earnings loss, consisting of lost net income after taxes, for injuries which prevent an "insured" from engaging in the employment in which the "insured" was engaged in immediately prior to the 'auto accident'.
The endorsement defined "insured" as:
(a) You or any "family member" injured in an "auto accident":
(1) While occupying an "auto"; or
(2) As a "pedestrian" when struck by an "auto".

(b) Anyone else injured in an "auto accident" while "occupying" or when struck as a "pedestrian" by "your covered auto" or a "temporary loaner vehicle".
The endorsement defined "auto accident," in pertinent part, as "an accident resulting from . . . . [t]he 'operation, maintenance, or use' of an 'auto' as an 'auto[.]' "

2. Part A governs liability coverage. Part C governs uninsured motorist coverage.

3. The Honorable Virginia Lea Crandall, judge presiding.

is limited to the extent to which the DTRIC policy's aggregate limit exceeds that of the First Insurance Policy. Thus, DTRIC's obligation to pay is limited to the DTRIC limit ($24,000) minus the First Insurance Limit ($12,000) for a total of $12,000.

2. DEBBIE YOKOTE is not entitled to recover additional wage loss benefits under the 1998 DTRIC policy as the DTRIC policy's aggregate limit does not exceed that of State Farm's Aggregate Limit. As such, DTRIC is not required to provide additional wage loss benefits to DEBBIE YOKOTE.

## III. Standard of Review.

 We review *de novo* a circuit court's grant or denial of a motion for summary judgment. *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). Accordingly,

[o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Pancakes of Hawai'i, Inc. v. Pomare Properties Corp.*, 85 Hawai'i 286, 291, 944 P.2d 83, 88 (App.1997) (citation and block quote format omitted). *See also* Hawai'i Rules of Civil Procedure Rule 56(c).[4] But where, as here, there can be no genuine issue of material fact because the facts before the circuit court on summary judgment were either admitted or undisputed, we apply the standard of review of a circuit court's conclusions of law:

Hawai'i appellate courts review conclusions of law *de novo*, under the right/wrong standard. Under the right/wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it. A conclusion of law will not be overturned if supported by the trial court's findings of fact and by the application of the correct rule of law.

*Robert's Hawai'i Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999) (brackets, citations, and internal quotation marks omitted).

## IV. Discussion.

On appeal, the Yokotes contend that the circuit court misapplied *Rana* in concluding that "stacking"[5] of optional wage loss cover-

---

**4.** Hawai'i Rules of Civil Procedure Rule 56(c) provides, in pertinent part:

The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

**5.** In *Rana v. Bishop Ins. of Hawai'i, Inc.,* 6 Haw.App. 1, 713 P.2d 1363 (1985), we noted various uses of the word "stacking":

"Stacking" may be defined as follows:

"Stacking," where permitted, makes more than one policy fully available to the injured party without proration between the companies held liable. The word "stacking," as used in the argot of the insurance industry implies and is intended to be used when one policy's

limit is "stacked" on top of another and possibly a third is "stacked" on top of the second. The claim is not paid by slicing through the stack like a piece of wedding cake but is paid by first using one layer, then another and so on.

Comment, *When Enough Isn't Enough: Supplementing Uninsured Motorist Coverage in Pennsylvania*, 54 Temp. L.Q. 281, 282–83, n. 5 (1981) (quoting P. Pretzel, Uninsured Motorists 87–88 (1972)).

"Intra-policy stacking involves *a single policy*" and "is achieved by permitting the insured to aggregate the limit coverage by multiplying the stated limit of liability by the number of vehicles covered under [the] policy." Comment, *Intra–Policy Stacking of Uninsured Motorist and Medical Payments Coverages: To Be or Not To Be*, 22 S.D.L.Rev. 349, 350 (1977) (emphasis in original). "[I]nter-policy stacking involves *more than one policy* and allows insurance coverage to be aggregated or 'stacked' to fully compensate the insured for

ages is prohibited. This question is at the threshold, because although *Rana* involved intra-policy stacking of wage loss coverages, in particular, *see* note 5, *supra*, we there announced a blanket ban against any "stacking of no-fault basic insurance coverages[.]" *Rana*, 6 Haw.App. at 13, 713 P.2d at 1372. The catholically categorical nature of our holding is understandable, given its primary rationale.

In *Rana*, we looked to the statutory language and legislative history of the no-fault auto insurance scheme then extant, and discerned therein mandatory coverages and maximum limits on mandatory coverages, along with safety-valve optional coverages, all evincing a fundamental legislative policy of keeping basic no-fault insurance premiums in check. *Id.* at 3–9, 713 P.2d at 1366–69. We deduced therefrom a legislative intent to prohibit any stacking of compulsory coverages, what we called "no-fault basic coverage":

> The legislative history of the No Fault Law evinces a legislative concern to reduce and stabilize automobile insurance costs prevailing prior to its enactment and to provide and maintain reasonable premium rates for no-fault basic coverage. We discern therefrom a legislative intent to prohibit stacking which indubitably will lead to higher premiums for no-fault basic coverage. We therefore conclude that HRS §§ 294–2(10) and –3(c) [ (1976) ] precludes the stacking of no-fault basic insurance

policies and coverages. To permit stacking would be contrary to an objective the legislature sought to achieve.

*Rana*, 6 Haw.App. at 8–9, 713 P.2d at 1369. It mattered not that Rana was seeking intra-policy stacking of his wage loss benefits, in particular. What mattered was, that wage loss coverage was then compulsory and thus a part of no-fault basic coverage, HRS §§ 294–2(10)(C) & –2(11) (1976), and hence could not be stacked: "Because no-fault insurance is compulsory insurance, and it is important that the premiums be kept as low as possible while allowing adequate coverage, there is a public policy argument against stacking." *Rana*, 6 Haw.App. at 13, 713 P.2d at 1371 (citation and internal quotation marks omitted). In this connection, we acknowledged Hawai'i cases holding that uninsured motorist coverages can be stacked, but distinguished those cases from Rana's case on the basis of optional versus compulsory coverages: "Furthermore, under our uninsured motorist statute although the automobile liability insurance policy must include uninsured motorist coverage, the insured may 'reject the coverage in writing.' HRS § 431–448 [ (1985) ]. However, ... no-fault basic coverage is compulsory for each motor vehicle." *Rana*, at 12–13, 713 P.2d at 1371.

■ Now, however, wage loss coverage is optional in the regnant no-fault auto insurance scheme, HRS § 431:10C–302(a)(4) (Supp.2002); [6] *see also* HRS § 431:10C–301

damages sustained." *Id.* (emphasis in original).

*Rana*, 6 Haw.App. at 5 n. 3, 713 P.2d at 1367 n. 3 (brackets in the original). *See also Yamaguchi v. State Farm Mut. Auto. Ins. Co.*, 706 F.2d 940 (9th Cir.1983), wherein an additional distinction was noted between " 'policy stacking'—the recovery of no-fault benefits under more than one insurance policy[,]" *id.* at 946, and " 'benefit stacking,' the recovery of duplicative benefits under two different policies for the same actual losses or expenses[.]" *Id.* at 946 n. 4. *Rana* was a case of "intra-policy stacking":

> The facts are not in dispute. In 1982, Bishop [Insurance of Hawaii, Inc.] issued to Rana a "Business Auto Policy" insuring seven automobiles owned and utilized by Rana in his taxicab business. On December 6, 1982, Rana was injured in an automobile collision while operating one of those automobiles. He sought payments of no-fault earnings loss benefits of $2,000 per month, his actual monthly loss, on

the theory that the "stacking" of no-fault basic coverage of $800 earnings loss benefits per vehicle under the policy was permitted and that the "stacked" aggregate limit would be seven vehicles times $15,000 or $105,000. Bishop, however, paid him the monthly statutory limit of $800 for his monthly earnings loss and terminated the payments at $15,000.

*Rana*, 6 Haw.App. at 3, 713 P.2d at 1365–66 (footnotes omitted).

6. Hawai'i Revised Statutes (HRS) § 431:10C–302(a)(4) (Supp.2002) provides, in relevant part, that "every insurer issuing a motor vehicle insurance policy shall make available to the insured the following optional insurance under the following conditions":

> (4) At the option of the insured, an option in writing for coverage for wage loss benefits for monthly earnings loss for injury arising out of a motor vehicle accident. Any change in the wage loss benefits coverage

(1993 & Supp.2002) (detailing the remaining compulsory coverages), and was when the two DTRIC policies in our case took effect. 1997 Haw. Sess. L. Act 251, § 70 at 553; *Allstate Ins. Co. v. Kaneshiro,* 93 Hawai'i 210, 214, 998 P.2d 490, 494 (2000) ("the statute in effect as of the [motor vehicle insurance] policy's effective date, governs the policy at issue and is part of the contract with full binding effect upon each party" (citations omitted)). Given its outmoded rationale vis à vis optional wage loss coverage in particular, *Rana's* precedent is here considerably blunted, if not wholly impuissant, and we decide that, for purposes of this case, it must be consigned and confined to its particular time and place. There is no longer a blanket prohibition, a`la *Rana,*[7] against stacking optional wage loss coverages, and the circuit court was wrong in so holding.[8]

Under the current no-fault scheme, wage loss coverage joins the uninsured and underinsured motorist coverages as optional coverages. HRS § 431:10C–302(a)(4); HRS §§ 431:10C–301(b)(3) & –301(b)(4) (1993 & Supp.2002); *Sol v. AIG Hawai'i Ins. Co.,* 76 Hawai'i 304, 308, 875 P.2d 921, 925 (1994) ("because [HRS § 431:10C–301(b)(3) ] provides that uninsured motorist coverage *may* be rejected, it is 'optional' additional coverage" (emphasis in the original)); *Allstate Ins. Co. v. Hirose,* 77 Hawai'i 362, 366, 884 P.2d 1138, 1142 (1994) (underinsured motorist coverage is "voluntary insurance" (citations and block quote format omitted)). And, as we recognized in *Rana,* 6 Haw.App. at 11–13,

> selected by an insured shall apply only to benefits arising out of motor vehicle accidents occurring after the date the change becomes effective. Coverage shall be offered in multiples of $500 a month/$3,000 per accident per person, from $500 a month/$3,000 per accident to $2,000 a month/$12,000 per accident; however, nothing shall prevent an insurer from making available higher limits of coverage[.]

7. In granting summary judgment, the first circuit court cited, along with *Rana,* the federal district court's opinion in *Nat'l Union Fire Ins. Co. v. Villanueva,* 716 F.Supp. 450 (D.Haw.1989). The *Villanueva* court simply recited *Rana's* holding and rationale, without elaboration, in deciding that the basic no-fault coverages involved could not be stacked. *Villanueva,* 716 F.Supp. at 453–55.

713 P.2d at 1370–71, a well-pedigreed line of Hawai'i cases held that optional uninsured motorist coverage may be stacked. *Calibuso v. Pacific Ins. Co., Ltd.,* 62 Haw. 424, 433, 616 P.2d 1357, 1362 (1980); *American Ins. Co. v. Takahashi,* 59 Haw. 59, 64, 575 P.2d 881, 884 (1978); *Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 49, 575 P.2d 477, 480 (1978); *Walton v. State Farm Mut. Auto. Ins. Co.,* 55 Haw. 326, 332–33, 518 P.2d 1399, 1402–03 (1974). The supreme court also held that optional underinsured motorist coverage may be stacked. *Hirose,* 77 Hawai'i at 371, 884 P.2d at 1147 ("under the circumstances of this case, [optional underinsured motorist] coverage, as with [optional uninsured motorist] coverage, was also subject to stacking"). If, as they say, *la cage aux folle,* we are compelled to inquire and affirmatively decide whether optional wage loss coverages may be stacked as well.

The supreme court has explained that its stacking cases could evolve because the legislature had left the issue of stacking to the courts:

> Rather, the legislature explicitly left the issue of stacking to the judiciary, stating: "Judicial decisions on stacking of benefits are not affected by this bill, and it is your Committee's intent to leave the issue of stacking to judicial determination." Sen. Conf. Comm. Rep. No. 215, in 1988 Senate Journal, at 675.

*Hirose,* 77 Hawai'i at 364–65, 884 P.2d at 1140–41.[9] In those cases, the supreme

8. We observe that, although the first circuit court concluded that stacking of wage loss benefits is not permissible under *Rana* and *Villanueva, supra,* it in effect declared that such stacking is permissible, in the sense of access to subject policy coverage, but only to the extent the aggregate policy limit of the subject policy exceeded that of the policy under which wage loss benefits were paid. We decide that this latter proviso was also incorrect, *infra.*

9. We recognize that the legislature has since prohibited general stacking of uninsured and underinsured motorist coverages, opting for required stacking options instead. *See* 1992 Haw. Sess. L. Act 123, § 4 at 209; *Britt v. U.S. Auto. Ass'n,* 86 Hawai'i 511, 512, 950 P.2d 695, 696 (1998); *Allstate Ins. Co. v. Hirose,* 77 Hawai'i 362, 364 n. 3, 884 P.2d 1138, 1140 n. 3 (1994) (but erroneously identifying the original amend-

court's determination that optional uninsured and underinsured motorist coverages may be stacked was purposed primarily to prevent derogation of the minima of such coverages required for each motor vehicle by statute: "Thus, although the [uninsured motorist] statute did not expressly permit stacking, this court has held consistently that the language of the statute requiring minimum coverage for each insured motor vehicle provides the basis for stacking of [uninsured motorist] coverages." *Id.* at 368, 884 P.2d at 1144. *See also Calibuso,* 62 Haw. at 433, 616 P.2d at 1362; *Takahashi,* 59 Haw. at 64, 575 P.2d at 884; *Morgan,* 59 Haw. at 48–49, 575 P.2d at 480; *Walton,* 55 Haw. at 328–29, 518 P.2d at 1401; *Hirose,* 77 Hawai'i at 370–71, 884 P.2d at 1146–47. This purpose was lodestar precisely because the statutory language [10] tied the uninsured motorist coverage of each applicable policy to the insured motor vehicle or vehicles:

Our uninsured motorist insurance statute provides that no policy of automobile or motor vehicle liability insurance shall be issued in this state "with respect to any motor vehicle" unless uninsured motorist insurance protection is concurrently made available in the policy or supplemental thereto. We are of the opinion that the

---

ing act as "*1993* Haw. Sess. L., Act 123 at 209" (emphasis added)). By mesne amendments, 1993 Haw. Sp. Sess L. Act 4, § 5 at 14; 1997 Haw. Sess. L. Act 251, § 38 at 535, the pertinent statutory language reads as follows:

(c) The stacking or aggregating of uninsured motorist coverage or underinsured motorist coverage is prohibited, except as provided in subsection (d).

(d) An insurer shall offer the insured the opportunity to purchase uninsured motorist coverage and underinsured motorist coverage by offering the following options with each motor vehicle insurance policy:

(1) The option to stack uninsured motorist coverage and underinsured motorist coverage; and

(2) The option to select uninsured motorist coverage and underinsured motorist coverage, whichever is applicable, up to but not greater than the bodily injury liability coverage limits in the insured's policy.

These offers are to be made when a motor vehicle insurance policy is first applied for or issued. For any existing policies, an insurer shall offer such coverage at the first renewal after January 1, 1993. Once an insured has been provided the opportunity to purchase or reject the coverages in writing under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured.

(e) If uninsured motorist coverage or underinsured motorist coverage is rejected, pursuant to section 431:10C–301(b):

(1) The offers required by section 431:10C–301(d) are not required to be made;

(2) No further offers or notice of the availability of uninsured motorist coverage and underinsured motorist coverage are required to be made in connection with any renewal or replacement policy; and

(3) The written rejections required by section 431:10C–301(b) shall be presumptive evidence of the insured's decision to reject the options.

HRS § 431:10C–301(c)–(e) (1993 & Supp.2002). However, the legislative history underlying this statutory change by no means indicates a legislative intent to preclude further judicial determinations regarding stacking, determinations theretofore explicitly consigned by the legislature to the judiciary. *Hirose,* 77 Hawai'i at 364–65, 884 P.2d at 1140–41. The legislature detailed the purpose of the original amending act, 1992 Haw. Sess. L. Act 123, § 4 at 209, as follows:

Providing that insurers shall offer optional uninsured (UM) and underinsured (UIM) coverage at lease [(sic)] equal to an insured's maximum bodily injury liability coverage, and optional stacking. Since the bill also contains a prohibition against the stacking of UM and UIM benefits, these provisions will allow consumers to obtain sufficient UM and UIM insurance coverages. This trade-off between the elimination of stacking and these optional coverages will be equitable only if consumers are fully informed of their loss of rights and ability to protect themselves through voluntary additional options at nominal cost[.]

Hse. Conf. Comm Rep. No. 150, in 1992 House Journal, at 878.

10. For example, the current statutory language defining optional uninsured motorist coverage reads as follows:

*With respect to any motor vehicle* registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in paragraph (1), under provisions filed with and approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided that the coverage required under this paragraph shall not be applicable where any named insured in the policy shall reject the coverage in writing[.]

HRS § 431:10C–301(b)(3) (1993 & Supp.2002) (emphasis added).

phrase "with respect to any motor vehicle" indicates that separate uninsured motorist coverage in at least the minimum statutorily required amounts must be provided for *each* automobile insured under a policy of liability insurance. Therefore, when two or more motor vehicles are insured under a single liability insurance policy, separate uninsured motorist insurance coverage is, in effect, created for each vehicle insured under the policy. Each vehicle insured under the policy thus carries a minimum of $10,000 in per person uninsured motorist insurance coverage.

*Morgan,* 59 Haw. at 48–49, 575 P.2d at 480 (footnotes and citation omitted; emphasis in the original). *See also Hirose,* 77 Hawai'i at 368–71, 884 P.2d at 1144–47 (the statute requiring optional underinsured motorist coverage [11] must be read in conjunction with the statute requiring optional uninsured motorist coverage, and thus, optional underinsured motorist coverage is subject to stacking). *Cf. Dines v. Pacific Ins. Co., Ltd.,* 78 Hawai'i 325, 327, 893 P.2d 176, 178 (1995) (in deciding whether an auto insurance policy is an applicable policy, uninsured motorist coverage is "personal to the named insured" and follows the named insured wherever he or she is injured by an uninsured motorist, regardless of whether the named insured is occupying an insured automobile, or occupying an automobile at all); *Kaneshiro,* 93 Hawai'i at 219, 998 P.2d at 499 ("the [uninsured/underinsured] policy is personal to the named insured; the coverage attaches to the insured person, not the insured vehicle" (citing *Dines, supra* )).

Hence, in the line of supreme court cases at hand, the insured could stack the uninsured or underinsured motorist coverage for each automobile insured under any applicable policy. In the most illustrative case, the claimant, who was an insured under her father's auto insurance policy because she was residing in his household, could stack the statutory minimum amount of uninsured motorist coverage for each of three cars insured under her father's policy, to the extent of her actual damages, even though she was driving a car owned by an unrelated person when she was struck and injured by an uninsured motorist. The claimant had already recovered the statutory minimum from the unrelated person's auto insurance policy. *Morgan,* 59 Haw. at 45–47, 575 P.2d at 478–79.

With these examples in mind, we turn to the case of optional wage loss coverage. Unlike the statutes requiring optional uninsured and underinsured motorist coverages, which tie coverage to the motor vehicle, the statute requiring optional wage loss coverage ties such coverage to the accident. HRS § 431:10C–302(a)(4) provides, in pertinent part, that "every insurer issuing a motor vehicle insurance policy shall make available to the insured the following optional insurance under the following conditions":

> (4) At the option of the insured, an option in writing for coverage for wage loss benefits for monthly earnings loss for injury arising out of a motor vehicle accident. Any change in the wage loss benefits coverage selected by an insured shall apply only to benefits arising out of motor vehicle accidents occurring after the date the change becomes effective. Coverage shall be offered in multiples of $500 a month/ $3,000 per accident per person, from $500 a month/$3,000 per accident to $2,000 a month/$12,000 per accident; however, nothing shall prevent an insurer from making available higher limits of coverage[.]

And, although this statute requires the insurer to offer fixed increments of optional wage loss coverage, and in that manner establishes an effective minimum amount of coverage, it does not prescribe a statutory minimum amount of coverage, *per se.*

Nonetheless, generally applicable provisions of the statute that detail the various

---

11. HRS § 431:10C–301(b)(4) (1993 & Supp. 2002), the current statute requiring optional underinsured motorist coverage, provides, in pertinent part:

Coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles. *An insurer may offer the underinsured motorist coverage required by this paragraph in the same manner as uninsured motorist coverage[.]*

(Emphasis supplied.)

required optional coverages indicate that optional coverages may not be derogated, as by an implied prohibition against inter-policy stacking. HRS § 431:10C–302(a)(6) (Supp. 2002) provides, in relevant part, that "every insurer issuing a motor vehicle insurance policy shall make available to the insured the following optional insurance under the following conditions":

(6) Terms, conditions, exclusions, and deductible clauses, coverages, and benefits which:

(A) Are consistent with the required provisions of the policy;

(B) Limit the variety of coverage available so as to give buyers of insurance reasonable opportunity to compare the cost of insuring with various insurers; and

(C) Are approved by the commissioner as fair and equitable[.]

In other words, if the legislature thereby encourages the auto insurance consumer to "shop around" for optional coverages, and would have it done in a meaningful and not illusory manner, the insurer under each applicable policy must be held to provide the optional wage loss coverage selected and paid for by the consumer for each covered accident. After all, the supreme court has stated that, with respect to optional uninsured and underinsured motorist coverages, "we have long subscribed to the principle that insurance policies must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer; policies are to be construed in accord with the reasonable expectations of a layperson." *Kaneshiro*, 93 Hawai'i at 220, 998 P.2d at 500 (brackets, ellipsis, citation and internal quotation marks omitted). *See also Dines*, 78 Hawai'i at 329, 893 P.2d at 180 ("insurance policies are to be construed in accord with the reasonable expectations of a layperson" (brackets, citation and internal quotation marks omitted)). And, that optional uninsured and underinsured motorist coverages are considered to be remedial in nature designed to afford maximum protection to a state's residents, and to fill the gaps in compulsory insurance plans....

. . . .

Being a remedial statute, HRS § 431:10C–301(b)(3) is to be construed liberally in order to accomplish the purpose for which it was enacted. Remedial statutes are liberally construed to suppress the perceived evil and advance the enacted remedy.

*Id.* at 327, 893 P.2d at 178 (footnote, brackets, original ellipsis, citations, block quote format and internal quotation marks omitted). *See also Kaneshiro*, 93 Hawai'i at 218, 998 P.2d at 498 (the same, but with respect to HRS § 431:10C–301(b)(4), the underinsured motorist statute).

▪ Hence, it appears that inter-policy stacking of applicable wage loss coverages must be permitted for each covered accident. Just as optional uninsured and underinsured motorist coverages could be stacked under the line of supreme court cases set forth above, so can optional wage loss coverages from applicable policies be stacked, albeit for distinct public policy reasons, and we so hold on the facts of this case.

▪ We are thus led, inexorably, to the Yokotes' other primary point on appeal; that is, whether an insurer can limit its liability for optional wage loss benefits by a policy provision, such as DTRIC's "Non–Duplication of Benefits" clause. Trusting that our answer to this question is not painfully patent from the foregoing discussion, we examine the Yokotes' reliance in this respect on *Walton, supra.*

*Walton* was the seminal case in the line of supreme court cases allowing stacking of uninsured and underinsured motorist coverages. While a passenger in a car driven by a third party, Walton was seriously injured in an accident involving an uninsured motorist. Walton collected the statutory minimum $10,000 in uninsured motorist benefits from his driver's insurer. Walton then attempted to tap the $10,000 in uninsured motorist coverage from his own insurer, in order to cover more of his $25,000 in actual damages. Walton's insurer refused his claim *in toto*, relying on the following policy provision:

Under coverage U [uninsured motorist provisions] with respect to *bodily injury* to an *insured* while *occupying* a motor vehi-

cle not owned by a named insured under this coverage, the insurance hereunder shall apply only as excess insurance over any other similar insurance available to such occupant, and this insurance shall then apply only in the amount by which the applicable limit of liability of this coverage exceeds the sum of the applicable limits of liability of all such other insurance.

*Walton*, 55 Haw. at 327 n. 1, 518 P.2d at 1400 n. 1 (brackets and emphases in the original).

The *Walton* court ·affirmed the lower court's invalidation of the provision. The supreme court's primary rationale in doing so, as previously noted, was the primacy of statutorily-mandated minimum coverage over policy provision:

The rule adopted in a very heavy majority of the jurisdictions that have dealt with the issue on appeal is that state statutory provisions, in many cases totally or very substantially identical with [the Hawai'i statute (then extant) requiring optional uninsured motorist coverage], must be interpreted as invalidating clauses in insurance policies that, if effectuated, would reduce the benefits directly payable by the injured-insured's insurer to a sum below the statutory minimum.

*Id.* at 328–29, 518 P.2d at 1401. The supreme court also observed that the legislative history of the subject statute had referred to "protection, through voluntary insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents[,]" and thereupon reasoned that the protective purpose thus revealed was "much more readily construed to invalidate, rather than validate," such provisions, where such provisions purport to delimit coverage below the insured's actual damages. *Id.* at 331, 518 P.2d at 1402 (citation and block quote format omitted).

The *Walton* court turned away the insurer's argument that stacking policies would place the insured in a better position than would obtain if the uninsured motorist had been insured for the statutory minimum, declaring that,

*Compensation for the injured party* is the more important focus of inquiry. There-

fore, there would be inequity only if insured tried to "pyramid" or "stack" several policy provisions to build up to a sum beyond his damage, and thus gain a windfall. But where the "pyramiding" or "stacking" would result in a sum equal to or less than insured's damage, to refuse to permit pyramiding would award the *insurer* the windfall, based on the none too compelling assumption that the uninsured would have only been insured to the statutory minimum. This assumption is not required and we cannot accept it. What insured would have received from an uninsured motorist is purely a matter of speculation.

*Id.* at 332, 518 P.2d at 1403 (brackets, citation and some internal quotation marks omitted; emphases in the original).

The *Walton* court finished by noting two supplementary arguments in support of its holding:

First of all, permitting recovery under both uninsured motorist coverages (but only until insured is indemnified for losses) avoids the potentially intricate problems involved in deciding whether injured-insured's own, or host driver's own, "uninsured motorist" coverage is considered the "excess" (or "secondary coverage") where both injured-insured and host driver have policy provisions such as those involved in the case at bar. Both insurers could, and sometimes have, disclaimed liability by pointing to the other insurer as the "primary" insurer. The key policy word is "available." It has been held that in such cases *neither* "other insurance" provision is valid.

Secondly and most importantly, it has been held to be unconscionable to permit an insurer to collect a premium for coverage of a type that the insurer is obligated by statute to provide and then to permit the insurer to use language insurer itself devised to avoid liability. More pithily stated: insurer charged a premium for the coverage; it cannot be permitted to vanish as the pea in the shell game[.]

*Id.* at 332–33, 518 P.2d at 1403 (footnote, brackets, citations and some internal quota-

tion marks omitted; emphasis in the original).

Hence, where the legislature has expressed a purpose to protect—in our case, giving "buyers of insurance reasonable opportunity to compare the cost of insuring with various insurers[,]" HRS § 431:10C–302(a)(6)—*Walton* counsels that policy provisions like DTRIC's must remain subordinate and invalid to the extent they derogate that purpose. *Walton*, 55 Haw. at 328–31, 518 P.2d at 1401–02. Where, as here, the legislature requires that an insurer's menu of optional coverages be meaningful, *Walton* counsels that an insurer may not reap a windfall by policy provisions that render the consumer's choice illusory. *Id.* at 332, 518 P.2d at 1403. Where, by happenstance or otherwise, one insurer honors its coverage, *Walton* counsels that another insurer may not delimit its applicable coverage by claiming that it is excess. *Id.* at 332–33, 518 P.2d at 1403. And, where the insured has paid a premium for a certain coverage from an insurer's menu of statutorily-required optional coverages, *Walton* counsels that "it cannot be permitted to vanish as the pea in the shell game[.]" *Id.* at 333, 518 P.2d at 1403 (citation and internal quotation marks omitted). We conclude that *Walton's* counsel is well taken, and operates to invalidate DTRIC's "Non–Duplication of Benefits" clause to the extent it purports to delimit the Yokotes' optional wage loss coverages below actual wage loss.[12]

## V. Conclusion.

The December 18, 2001 amended final judgment of the circuit court, and the circuit court's amended order of even date, are vacated. We remand for the circuit court's consideration and disposition, consistent with

this opinion, of DTRIC's ultimate prayer, "That the court otherwise decide and determine the respective rights, duties and obligations of the parties under the 1998 DTRIC policy and 2000 DTRIC policy."

Dissenting Opinion by FOLEY, J.

I respectfully dissent because I find the "Non–Duplication of Benefits" provision of DTRIC's policies in this case to be clear and unambiguous and not in contravention of Hawai'i Revised Statutes § 431:10C–302 (providing for optional wage loss benefits coverage).

---

12. *Yamaguchi v. State Farm Mut. Auto. Ins. Co.*, 706 F.2d 940 (9th Cir.1983), which Dai–Tokyo Royal State Insurance Company (DTRIC) relied on below in arguing that its "Non–Duplication of Benefits" clause is valid, is inapposite. The *Yamaguchi* court held that no-fault basic coverages could be stacked. *Id.* at 948–49. In *Rana*, as previously discussed, we concluded to the contrary, and in doing so we cited *Yamaguchi* and held that, "The state courts are the final arbiters of the State's own law. Thus, we are not bound by the federal court's interpretation of our

statutes. We disagree with the *Yamaguchi* court." *Rana*, 6 Haw.App. at 9–10, 713 P.2d at 1369–70 (footnote, brackets, ellipsis, citations and internal quotation marks omitted). The *Yamaguchi* court also decided that a limitations clause there, similar to DTRIC's here, was valid according to its terms. *Yamaguchi*, 706 F.2d at 955–56. Here again, we are not bound by federal court's interpretation, and we disagree with the *Yamaguchi* court. *Rana*, 6 Haw.App. at 9–10, 713 P.2d at 1369–70.