Electronically Filed
Supreme Court
SCWC-15-0000325
09-MAR-2020
10:49 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

JIJUN YIN, Petitioner/Plaintiff-Appellant,

vs.

P.I. AGUIAR, AS PERSONAL REPRESENTATIVE OF
VIRGINIO C. AGUIAR, JR., DECEASED, KEVIN AGUIAR and AGEE, INC.,
Respondents/Defendants-Appellees.

SCWC-15-0000325

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000325; CIV. NO. 11-1-0331)

MARCH 9, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

In this case, the Petitioner filed a complaint in the Circuit Court of the Third Circuit (circuit court) alleging that the Respondent's cattle trespassed onto his property causing damage to his sweet potato crop. In granting the Respondent's motion for summary judgment, the circuit court concluded that

the Petitioner's land was neither "properly fenced" nor "unfenced," and therefore Hawai'i's statutory law governing the trespass of livestock onto cultivated land did not apply to the Petitioner's property.  Further, the circuit court determined that a provision in the Petitioner's lease, making the Petitioner fully responsible for keeping cattle out of his cultivated land, was not void against public policy.  The Intermediate Court of Appeals affirmed the circuit court's judgment.

Upon review of the legislative history of the statutes that govern the trespass of livestock onto the cultivated land of another, we conclude that the legislature intended to hold owners of livestock liable for the damage caused by the trespass of their animals on cultivated land whether the land is properly fenced or not.  Further, we determine that the lease provision in this case has the effect of absolving the Respondent of liability for livestock damage to Petitioner's cultivated land and therefore is contrary to statutory law and public policy, and it is thus invalid.

## I.  BACKGROUND

On August 10, 2009, Paradise Homes, LLC, entered into an eighteen-month lease ("lease") in which it agreed to lease fifty acres of land to Jijun Yin for agricultural purposes in the Pauka'a area of the District of Hilo, Hawai'i.  Under the

"Rent" subsection of the lease was a provision that stated, "Licensee is fully responsible [for] keeping cattle[] out of [their] crops." Additionally, one page of the lease was an unsigned and undated page that stated, "Remove all cattle[] across from my farmland. Do [n]ot raise cattle[] across from my [f]armland." In February 2010, another lease between Paradise Homes and Yin was executed, and the provision, stating "Licensee is fully responsible [for] keeping cattle[] out of [their] crops," was included in the 2010 lease.

On August 29, 2011, Yin filed a complaint ("complaint") against Virginio Aguiar, Jr.,[1] Kevin Aguiar, and Agee, Inc. (collectively "the Aguiars"), who owned and pastured cattle near Yin's leased property. The complaint alleged that in September 2009, Kevin Aguiar "released and/or caused" cattle owned by the Aguiars to trespass onto Yin's leased property that resulted in the cattle eating some of Yin's sweet potato crop.[2] Following this incident, the complaint contended, a meeting was held between Yin and Kevin Aguiar and Paradise Homes' managing agent, Teresa Prekaski,[3] and an agreement was reached that the

---

[1]     Virginio died during the pendency of the suit.

[2]     The complaint stated that Virginio was the President and Director of Agee, Inc., and Kevin Aguiar was an employee.

[3]     Paradise Homes, LLC was also the owner of the property leased by the Aguiars.

Aguiars would prevent their cattle from trespassing onto the property possessed and farmed by Yin.

In March 2011, the complaint stated, Kevin Aguiar released more than 50 cattle in close proximity to Yin's property, resulting in the cattle trespassing onto Yin's property and destroying over 13 acres of Yin's sweet potato crop. After Yin removed the cattle from his property, the complaint alleged, Yin noticed that Kevin Aguiar had left open his gate and allowed his cattle to again trespass onto Yin's property. The complaint contended that the trespassing cattle caused more than $190,000 worth of damage, including the "loss of [Yin's] over 13 acres of sweet potato crop and damage to his fencing."

The complaint asserted that the Aguiars were strictly liable to Yin for the damage to his crops caused by the trespass of their cattle in accordance with statutory law. Yin also claimed that Kevin Aguiar knew or should have known that allowing the cattle outside of the fenced and gated area where he pastured the cattle would likely result in the cattle trespassing onto Yin's property and that his crops were destroyed as a direct and proximate result of the Aguiars'

"willful, wanton, deliberate, intentional and/or negligent conduct."[4]

The Aguiars' answer to the complaint admitted that a meeting occurred in September 2009 between Kevin Aguiar, Yin, and Prekaski after an incident on Yin's leased property, but the answer denied the essential allegations of the complaint. Additionally, the Aguiars raised numerous defenses, including failure to state a claim, comparative negligence, assumption of the risk, lack of notice, failure of Yin to mitigate damages, statute of limitations, laches, estoppel, waiver, and unclean hands. The Aguiars alleged that they exercised reasonable care at all times, and that their conduct was not a proximate cause of Yin's alleged damages.[5] Thus, the Aguiars requested that the complaint be dismissed with prejudice.

After discovery was conducted, the Aguiars filed a motion for summary judgment as to all claims. In a memorandum accompanying the motion, the Aguiars argued that they were entitled to summary judgment because, as a matter of law, they did not owe a duty to construct a cattle fence that prevented the cattle from entering Yin's land. Instead, the Aguiars

---

[4] Additionally, the complaint alleged that the Aguiars were liable for Yin's severe emotional distress and that Yin was entitled to punitive damages.

[5] The Aguiars also denied that they engaged in intentional, outrageous, or aggravated conduct that warranted the assessment of punitive damages.

5

contended, Yin was solely responsible for constructing a cattle fence because he assumed the duty when he leased the land; the Aguiars noted that Yin's lease specifically provided that "he 'is fully responsible [for] keeping cattle[] out of [their] crops.'"

The Aguiars also asserted that Hawaiʻi Revised Statutes (HRS) § 142-63 did not prevent the entry of summary judgment in their favor because the statute did not apply to Yin's claims as "it is only applicable to claims involving trespass on 'properly fenced cultivated ground[.]'"[6] Yin's property was not "properly fenced," the Aguiars contended, because "the fence was poorly constructed and did not prevent cattle from entering his land." Specifically, the Aguiars stated that Yin's fence was only two and one half to three feet tall and used hog wire instead of barbed wire. Because the fence was under four feet tall and used loosely-wound hog wire, it did not satisfy the definition of a "lawful fence" under HRS § 142-61, the Aguiars argued.[7] Nor

_____

[6]    HRS § 142-63 (1993) provides the following:

    If any cattle, horse, mule, ass, swine, sheep, or goat, trespasses on any properly fenced cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowners, or to any person in possession of the land, whoever suffers the damage or loss.

[7]    HRS § 142-61 (1993) provides, in relevant part, the following:

    (a) Every fence made of stone, posts and rails, posts and boards, posts and wire, or other suitable materials shall be a lawful fence, provided that it is not less than four

(continued . . .)

did HRS § 141-64 apply, contended the Aguiars, because the statute only applies to trespass claims on unfenced cultivated ground, and Yin's property was not unfenced.[8]  Thus, because they were not liable for Yin's alleged damages, the Aguiars concluded, they were entitled to summary judgment.

In his memorandum in opposition, Yin argued that the lease between himself and Prekaski was unenforceable because it was "contrary to the public good."  Yin contended that Hawai'i law supports the principle that courts should not enforce contracts contrary to public policy.  (Citing Inlandboatmen's Union v. Sause Bros., Inc., 77 Hawai'i 187, 196, 881 P.2d 1255, 1264 (App. 1994).)  Yin argued that his lease violated an explicit public policy established by HRS §§ 142-63 and 142-64 that shifts the liability of livestock damage from the property

---

(. . . continued)

feet in height, substantially built, strong and close, existing in good state of repair, and capable of turning either all stock or all stock excepting swine, attempting to pass through the fence.

(b) Woven wire, or what is otherwise known also as hog-wire, used as a type of wire by itself or with a combination of barbed wire or plain wire, when supported on posts and properly fastened thereto and meeting the minimum height and stock turning requirements prescribed in subsection (a), shall be a lawful fence.

[8]  HRS § 142-64 (1993) provides that "[i]f any of the animals mentioned in section 142-63 trespasses on any unfenced cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowner or to any person in possession of the land, whoever suffers the damage or loss."

owner to the livestock owner.  Thus, cattle owners hold the burden to prevent their cattle from doing damage to adjacent farmland and are liable for the damage caused by their cattle, Yin concluded.

In reply, the Aguiars maintained that they were entitled to summary judgment because Yin did not raise any genuine dispute of material fact and his argument that his lease violated public policy was unsupported by the facts. Specifically, the Aguiars contended that neither the statutes nor public policy prevented Prekaski from requiring Yin to build a fence to protect his property because HRS §§ 142-63 and 142-64 do not prohibit landlords from requiring their tenants to construct fencing as part of lease agreements.

The circuit court granted the Aguiars' motion and concluded that they met their burden of producing evidence that HRS §§ 142-63 and 142-64 did not apply because Yin's property was not "properly fenced" so as to prevent cattle from entering.[9] And HRS § 142-64 did not apply, the court stated, because the land was not "unfenced."  Further, the court concluded that the lease provision at issue was not void against public policy under the standards described in Inlandboatmen's Union because the provision only shifts the duty to fence from the rancher to

_____

[9]     The Honorable Greg K. Nakamura presided.

the farmer by a contract on lands leased to them by a common lessor.[10]

The court's order granting summary judgment as to all claims was filed on March 27, 2015, and its order granting in part and denying part the Aguiars' motion for fees and costs was granted on June 9, 2015. The court issued its judgment on July 1, 2015, incorporating the rulings on these orders. Yin filed a timely notice of appeal from the judgment.

## II. ICA PROCEEDINGS

On appeal, Yin argued that the circuit court erred in granting summary judgment in favor of the Aguiars based on the court's erroneous interpretation of HRS §§ 142-63 and 142-64 and its conclusion that he had a contractual obligation to protect his crops from damage by trespassing cattle that precluded any liability on the part of the Aguiars. Yin contended that HRS §§ 142-63 and 142-64 taken together, impose liability for livestock damage to cultivated land, whether the land is legally fenced or not. This is bolstered by the statutes' legislative history, Yin explained, as the statutes were amended to their

---

[10] The circuit court also concluded that the Aguiars satisfied their burden to produce evidence that they are third-party beneficiaries of the provision of Yin's lease that provides that Yin "is fully responsible [for] keeping cattle[] out of [their] crops" because the Aguiars produced evidence that they "bargained with Ms. Prekaski for the . . . provision." Additionally, the court found that the Aguiars met their burden of producing evidence that it was reasonable for them to rely upon Yin's lease in continuing to maintain cattle on Ms. Prekaski's land and that they had the power to impose the duty set forth in the lease provision at issue upon Yin.

9

present forms in 1975 with the intent to simplify determination of damages in animal trespass cases. Rather than combining the two statutes, the 1975 amendment was grafted onto the pre-existing statutes that divided liability according to whether or not the land was fenced, Yin argued. As to the lease, Yin argued that evidence of the contract between Prekaski and Yin was not sufficient to summarily render the statutes' public policy inapplicable to this case.

The Aguiars responded that they were not liable for any damage to Yin's crops because Yin bore the duty to build a fence by the inclusion of a provision in his lease making him responsible for damage caused by cattle to his crops. Additionally, the Aguiars argued that HRS §§ 142-63 and 142-64 did not prevent the enforcement of the lease or relieve Yin of his duty under the lease because the statutes were irrelevant as they did not provide that cattle owners must construct fencing on properties where cattle are kept. And regarding the lease itself, the Aguiars contended that Yin failed to identify a specific policy or statute that prevented the lease from requiring him to construct fencing and failed to explain why his lease is different from other contracts through which a party assumes duties as part of the contract. Nor did HRS §§ 142-63 and 142-64 apply because they do not address liability when a

fence is neither properly fenced nor unfenced, the Aguiars argued.[11]

In its summary disposition order, the Intermediate Court of Appeals (ICA) first stated that Yin's opening brief made new arguments concerning the interpretation, legislative intent, and legislative history of HRS §§ 142-61, 142-63, and 142-64 that had not been made before the circuit court.[12] The ICA explained that it would not address such arguments, and it would only consider the plain meaning and application of the statutes. The ICA found that the plain and unambiguous meaning of those statutes demonstrated that neither HRS § 142-63 nor HRS § 142-64 applied because Yin's property was neither unfenced nor properly fenced. And because Yin affirmatively accepted the duty to keep the cows off his property, the ICA concluded, the Aguiars were not liable for the damage caused by their cattle.[13]

---

[11]  Yin also challenged the circuit court's order granting in part and denying in part the Aguiars' motion for fees and costs, arguing inter alia that Yin's success on appeal would obviate the prevailing party basis for the award under Hawaiʻi Arbitration Rules (HAR) Rule 25.

[12]  The ICA's summary disposition order can be found at Yin v. Aguiar, No. CAAP-15-0000325, 2019 WL 948460 (App. Feb. 27, 2019).

[13]  The ICA also concluded that the Aguiars met their burden of producing evidence that the purpose of the lease provision was to benefit them in that Yin had the duty to fence his property to prevent cattle from entering, it was reasonable for the Aguiars to rely on the lease provision in continuing to maintain cattle on the land, and the Aguiars met their burden of producing evidence that they were intended beneficiaries of the lease. The ICA did not expressly rule on Yin's argument that the lease violated a public policy established by HRS §§ 142-63 and 142-64. The ICA affirmed the circuit court's award of fees and costs.

### III. STANDARDS OF REVIEW

#### A. Summary Judgment

We review a circuit court's grant or denial of summary judgment de novo.  Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citing Hawai'i Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)).

#### B. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo."  Peer News LLC v. City & Cty. of Honolulu, 138 Hawai'i 53, 60, 376 P.3d 1, 8 (2016).

### IV. DISCUSSION

#### A. Livestock Owners Are Liable for Damages Caused by Their Livestock Trespassing onto Cultivated Land.

In its decision, the ICA only considered "the plain meaning and application of HRS §§ 142-61, 142-63, and 142-64," and it did not examine the legislative history of HRS §§ 142-63 or 142-64 because it concluded that the statutes were unambiguous and Yin failed to raise such arguments before the circuit court.

> HRS §§ 142-63 and 142-64 provide as follows:

> §142-63 Trespass on fenced cultivated land.  If any cattle, horse, mule, ass, swine, sheep, or goat, trespasses on any properly fenced cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowners, or to any person in possession of the land, whoever suffers the damage or loss.

> §142-64 On unfenced cultivated land.  If any of the animals mentioned in section 142-63 trespasses on any unfenced

12

cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowner or to any person in possession of the land, whoever suffers the damage or loss.

Yin maintains that the ICA erred because its interpretation of HRS §§ 142-63 and 142-64 created an unreasonable loophole in the statutes by holding that his land was neither "unfenced" nor "properly fenced." Yin asserts that the statutes impose liability on owners of livestock for all damages caused to crops when the livestock trespasses on another person's land.

We first consider whether the ICA erred in concluding that the statutes were unambiguous and then review whether the ICA erred in determining that neither HRS §§ 142-63 nor 142-64 were applicable in this case.

**1. There Exists Ambiguity as to a Livestock Owner's Liability When a Fence Does Not Satisfy the Qualifications of a "Lawful Fence."**

It is well established that "implicit in the task of statutory construction is [an appellate court's] foremost obligation to ascertain and give effect to the intention of the legislature." Louie v. Hawaii Gov't Emps. Ass'n, 133 Hawai'i 385, 400, 328 P.3d 394, 409 (2014) (quoting State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)). "When there is doubt . . . or uncertainty of an expression used in a statute, an ambiguity exists." Farmer v. Admin. Dir., 94 Hawai'i

232, 236, 11 P.3d 457, 461 (2000) (quoting <u>Konno v. Cty. of Hawai'i</u>, 85 Hawai'i 61, 71, 937 P.2d 397, 407 (1997)); <u>see also</u> <u>State v. DeMello</u>, 136 Hawai'i 193, 206, 361 P.3d 420, 433 (2015) (Pollack, J., dissenting) ("Assigning the statute's ambiguous language a 'plain meaning' without reference to the legislative history . . . would not only be an abuse of the plain meaning doctrine, but it would also be contrary to this court's duty to 'ascertain and give effect to the intention of the legislature.'" (quoting <u>State v. McKnight</u>, 131 Hawai'i 379, 388, 319 P.3d 298, 307 (2013))).

Under the Hawai'i Revised Statutes, the owner of "any cattle" that "trespasses on any <u>properly fenced cultivated ground</u>, . . . shall pay upon proof, the full amount of the damage or loss to the landowners." HRS § 142-63 (emphasis added).[14] Although HRS Chapter 142 does not provide a definition for "properly fenced," it defines "lawful fence" as a "fence made of stone, posts and rails, posts and boards, posts and wire, or other suitable materials . . . provided that it is not less than four feet in height, substantially built, strong and close, existing in good state of repair, and capable of turning either all stock or all stock excepting swine, attempting to

_____

[14] HRS §§ 142-63 and 142-64 apply to "any cattle, horse, mule, ass, swine, sheep, or goat." For readability, this opinion refers to these animals collectively as "cattle" or "livestock."

pass through the fence."[15]  HRS § 142-61(a).  If the fence is made of "[w]oven wire," otherwise known as "hog-wire," then it must be "supported on posts and properly fastened thereto and meet[] the minimum height and stock turning requirements prescribed in subsection (a)" in order to constitute a "lawful fence."  HRS § 142-61(b).

The Hawaiʻi Revised Statutes unequivocally impose liability on the owners of livestock in situations when their animals damage a crop owner's "properly fenced" cultivated land.  To constitute "properly fenced," the fence must be (1) at least four feet in height, (2) "substantially built," (3) "strong and close," (4) "existing in [a] good state," and (5) "capable of turning [away] all stock . . . attempting to pass through the fence."  HRS § 142-61.  A failure by the crop owner to satisfy any of these requirements would result in a determination that the property was not "properly fenced."  But proving all four of these elements results in circular reasoning because a property that is otherwise "properly fenced" would not allow livestock to gain entry as the definition requires that the fence be capable of "turning [away] all stock."  That is, the trespass itself would arguably relieve the livestock owner from liability

---

[15]  Based on our discussion of the legislative history of the livestock statutes, see infra, we deduce that "lawful fence" is intended to be used to define "properly fenced."

because a "proper[] fence[]" would have been able to turn away the animal.[16]

Thus, while HRS § 142-63 clearly holds livestock owners liable when "any cattle . . . trespass[] on any properly fenced cultivated ground," HRS § 142-61 seemingly renders this provision a virtual nullity absent intentional damage to an otherwise "proper[] fence[]." This incongruity creates ambiguity in the application of the plain text of these statutes and specifically as to a livestock owner's liability when a fence does not satisfy the qualifications of a "lawful fence" under HRS § 142-61 because, under the interpretation given by the circuit court, such a fence would also render liability under HRS § 142-64 inapplicable. The ICA therefore erred in concluding that the statutes were unambiguous.[17]

---

[16]    Indeed, the Aguiars argued in their Answering Brief that, inter alia, "[t]he inadequacy of [Yin]'s fence is established by evidence that cattle walked through or over [his] fence."

[17]    To the extent that the ICA did not consider the legislative history or intent of the statutes because Yin did not raise the issues before the trial court, we have previously held that appellate courts may "resolve[] a properly preserved issue by answering a threshold or dispositive question of law, even though the argument is not advanced by the parties." Cox v. Cox, 138 Hawai'i 476, 488, 382 P.3d 288, 300 (2016) (citing Waldecker v. O'Scanlon, 137 Hawai'i 460, [466-67], 375 P.3d 239, 245-46 (2016); Akamine & Sons, Ltd. v. Hawaii Nat'l Bank, 54 Haw. 107, 114-15, 503 P.2d 424, 429 (1972)). Because Yin properly preserved the argument that HRS §§ 142-63 and 142-64 provide that livestock owners are liable for the damages caused by the trespass of their animals, the ICA had the duty to give effect to the intention of the legislature in applying these statutes.

## 2. The Legislature Intended To Impose Liability on Livestock Owners for All Proven Damages to Cultivated Land.

When we interpret ambiguous statutes, "[t]he meaning of the ambiguous words may be sought by examining the context[] with which the ambiguous words, phrases, and sentences" were enacted.  State v. Brantley, 99 Hawai'i 463, 464, 56 P.3d 1252, 1253 (2002) (first alteration in original).  We may also "resort to extrinsic aids in determining legislative intent" such as legislative history.  Id. at 464-65, 56 P.3d at 1253-54.

This case involves the interpretation of HRS §§ 142-63 and 142-64, which were last amended in 1975.  Specifically, we are required to determine the meanings of the terms "properly fenced" and "unfenced" as used in these provisions.  The terms first appeared in the statutes addressing the trespassing of livestock ("livestock statutes") in 1888, but the livestock statutes had protected trespass onto cultivated land as early as 1841.  We therefore begin our review of the legislative history of HRS §§ 142-63 and 142-64 by considering the evolution of the early laws regarding livestock trespass and the amendments made in 1888 and 1975.

### a. Early Laws Regarding Livestock Trespass

The first statute regarding trespassing livestock was enacted in 1841 as part of the Laws of the Hawaiian Kingdom ("1841 Act").  Translation of the Constitution and Laws of the

17

Hawaiian Islands, Established in the Reign of Kamehameha III, Ch. XIV, at 58 (1842) [hereinafter Laws of 1842].  When the 1841 Act was enacted, King Kamehameha III explained that "there [was] at the present time a considerable number of people who [were] greatly annoyed by having their cattle held in confinement without cause" and that "farmers [were] greatly annoyed, by having their vegetables destroyed" by unconfined cattle.  Id. To resolve this problem, King Kamehameha III made it "illegal for beasts to [roam] at large, unless the cultivated grounds [were] enclosed by a fence."  Id.  If the "cultivated ground" was surrounded by a fence, then animals were allowed to roam, but "if any animal [was] really mischievous and br[oke] away the fence or jump[ed] over it, then the owner of the animal [was required to] pay according to the amount of food destroyed and the loss sustained."  Id.  The 1841 Act distinguished that situation from one in which a fence "bec[a]me rotten" or "f[e]ll down" and exposed the cultivated land.  Id.  In such cases, the owner of "the animal not being [at] fault and not being of a mischievous character shall pay no fine."  Id.  However, "if it was generally known that the fence was poor and out of repair, and on that account most of the people confined their animals," the animal owner was liable for "all damages done by his animals."  Id. at 58-59.

18

In 1846, "in consideration of the numerous petitions presented" to "[t]he Nobles and Representatives of the Hawaiian Islands," a law entitled "Joint Resolutions Respecting Estrays" was enacted ("1846 Act"), increasing statutory protection to the owners of cultivated land. 2 Statute Laws of His Majesty Kamehameha III, at 72 (1847) [hereinafter 1847 Stat. Laws]. Under the 1846 Act, "if any kine,[18] horse, mare, mule or ass commit[ed] any trespass on any cultivated ground," the livestock owner was liable to the cultivated landowner for "the sum of five dollars for the trespass of each animal" and "the full amount of" the damage to the production of land. Id. § 1, at 72. The 1846 Act also included a provision that made livestock owners liable for the trespass of their animals onto uncultivated land.[19] Id. § 2, at 72. The 1846 Act thus increased statutory protection to landowners by making the livestock owner liable for trespass onto cultivated and uncultivated land regardless of the existence or condition of a fence. See id.

---

[18] "Kine" is an archaic plural of "cow." Kine, Webster's Unabridged Dictionary (2d. ed. 2001).

[19] Section 2 of the 1846 Act provided as follows:

That if any animal or animals of any person commit any trespass on any uncultivated ground, the owner of the animal or animals shall forfeit and pay to the owner of the ground, four times the amount of damage done, or of value destroyed.

1847 Stat. Laws § 2, at 72.

A decade later, a new law "Relating to Estrays and Pounds" was passed ("1856 Act").  Laws of His Majesty Kamehameha IV, 1856 Sess. Laws, at 49 [hereinafter 1856 Sess. Laws].  Section 5 of the 1856 Act provided that if any livestock "commit a tres[]pass on any cultivated ground, the owner of said animal or animals shall forfeit and pay to the owner of the ground the sum of fifty cents for the trespass of each animal" plus "full amount" of any damage to the "productions of the land."[20]  Id. § 5, at 50.  Like the previous iteration of the law, the 1856 Act required an owner of livestock to pay a set amount per head for the trespass of the owner's animals onto "any uncultivated ground."[21]  Id. § 6, at 50.  In addition, the 1856 Act contained

_____

[20]    Section 5 of the 1856 Act provided in part as follows:

> If any horse, mule, ass, hog, or neat cattle, commit a tres[]pass on any cultivated ground, the owner of said animal or animals shall forfeit and pay to the owner of the ground the sum of fifty cents for the trespass of each animal, excepting sheep and goats, which shall be six cents; and if any productions of the land be destroyed or other damage done by the animal or animals, the owner thereof shall further pay to the loser the full amount of such damage or loss[.]

1856 Sess. Laws § 5, at 50.

[21]    Section 6 of the 1856 Act provided in part as follows:

> If any of the animals enumerated in the last preceeding section commit a trespass on any uncultivated ground, the owner of such animal or animals shall forfeit and pay to the owner of the ground twelve and a half cents for the trespass of each animal, excepting sheep and goats, for which he shall pay six cents per head, and if any damage be done by the animal or animals, the owner thereof shall pay to the loser the full amount of such damage[.]

1856 Sess. Laws § 6, at 50.

a provision that increased the penalties listed in sections 5 and 6 when the trespass occurred onto "land enclosed by a lawful fence":

> The owner of any horse, mule, ass, neat cattle, swine, sheep or goat trespassing upon land enclosed by a lawful fence, shall forfeit and pay to the owner of such land, if cultivated, twice the penalty prescribed in section fifth; and if the land is uncultivated, . . . twice the penalty prescribed in section sixth, and shall also in each case pay the full amount of damage done by such animal or animals.

Id. § 8, at 51 (emphases added).

The 1856 Act also provided the criteria a barrier needed to meet to qualify for additional penalties as a "lawful fence" under section 9 of the 1856 Act.[22]  Id. § 9, at 51. Accordingly, trespass onto any cultivated or uncultivated land that was enclosed with anything less than a lawful fence would be compensable only under sections 5 or 6.  In addition, the 1856 Act increased protections to landowners by broadening the category of animals for which a livestock owner was liable to include "hog," "swine," "sheep" and "goats."  See id. §§ 5, 6,

---

[22]    The 1856 defined a "lawful fence" as follows:

> Every enclosure shall be deemed a lawful fence which is four feet high, if made of stone, and if made of wood, iron wire, or an artificial pali, five feet high; if made upon an embankment of a ditch three feet deep, or upon an artificial or natural pali three feet high, then the fence must be two feet high said fence to be substantial, reasonably strong and close, made to turn stock.  If the fence be a ditch only, then it shall be nine feet wide at the top and four feet deep, and if a hedge, five feet high, thigh and high to turn stock.

1856 Sess. Laws § 9, at 51.

21

8, at 50-51. The 1856 Act thus created a liability scheme that held a livestock owner liable for the trespass of the owner's animals onto any land, cultivated or uncultivated, and the existence of a lawful fence only determined the additional damages that would be awarded.

In 1859, these provisions were compiled and codified into Hawai'i's first civil code ("1859 Civil Code") as sections 239, 240, 242, and 243. See The Civil Code of the Hawaiian Islands §§ 239, 240, 242, 243, at 54-55 (1859) [hereinafter 1859 Civ. Code]. The provisions in the 1859 Civil Code were largely the same as the 1856 Act, with the exception of section 243, which amended the definition of a "lawful fence."[23] See 1859 Civ. Code § 243, at 54. These provisions were also compiled into the civil code in 1884 and were unchanged except for minor stylistic changes in section 239 (trespass onto cultivated land)

---

[23] The 1859 Civil Code defined "lawful fence" as follows:

Every fence shall be deemed a lawful fence which is five feet high, if made of stone; or which is five feet high, if a hedge, or if made of wood, iron wire, or an artificial pali; or which is two feet high, if made upon an embankment of a ditch three feet deep, and at least two feet wide at the bottom, or upon an artificial or natural pali, three feet high. If the fence be a ditch only, then it shall be nine feet wide at the top, and four feet deep. Every fence to be a lawful fence, shall be substantially built, and reasonably strong and close to turn stock.

1859 Civ. Code § 243, at 55.

and an addition in section 240.[24]  Compare id. §§ 239-243, at 54-55 with Compiled Laws of the Hawaiian Kingdom §§ 239-243, at 55-57 (1884) [hereinafter 1884 Civ. Code].

Thus, the evolution of the early statutes addressed the concerns of farmers who were "greatly annoyed, by having their vegetables destroyed" by unconfined livestock, Laws of 1842, at 58, and indicated the framers' intent to impose liability on livestock owners for the trespass of their animals onto all cultivated land and to provide increased protection to cultivated land enclosed with a lawful fence.

We next consider whether amendments made to the livestock statutes in 1888 introducing the terms "properly fenced" and "unfenced" were intended to exclude certain cultivated land from statutory protection.

### b. 1888 Amendments

Beginning in 1846, the livestock statutes provided statutory protection to all cultivated land, and they afforded an even greater level of protection in 1856 to lawfully fenced, cultivated land by increasing the amount of statutory damages a crop owner received for the physical trespass.  1847 Stat. Laws §§ 1-2, at 72; 1856 Sess. Laws §§ 5-8, at 50-51; 1859 Civ. Code §§ 239-243, at 54-55; 1884 Civ. Code §§ 239-243, at 55-57.

---

[24]  Section 240 of the Civil Code was amended in 1864 by adding a paragraph that empowered the "Governor of Oahu" to impound livestock grazing on certain public roads and environs.  1884 Civ. Code § 240, at 56.

23

These statutes thus placed liability on livestock owners for trespass of their animals onto any cultivated land.  See Laws of 1842, at 58-59; 1847 Stat. Laws §§ 1-2, at 58-59; 1856 Sess. Laws §§ 5-8, at 50-51; 1859 Civ. Code §§ 239-243, at 54-55; 1884 Civ. Code §§ 239-243, at 55-57.

In 1888, a statute amending and consolidating the law relating to "Pounds, Estrays, Brands and Marks" was enacted ("1888 Act").  Laws of His Majesty Kalakaua I, 1888 Sess. Laws Act 35, at 74 [hereinafter 1888 Sess. Laws].  An original draft of the 1888 Act ("Bill No. 27") indicates that the drafters of the bill intended to continue providing statutory protection to all cultivated land by setting forth a livestock owner's liability for trespass onto cultivated land into a single provision.[25]  This consolidated provision functionally incorporated the increased penalties from the prior law and substituted the phrase "enclosed by a lawful fence" with "properly fenced."  The provision in the original draft of Bill No. 27 read as follows:

> Sec. IX:  If any cattle horse, mule, ass, hog, sheep or goat shall trespass on any cultivated ground, the same being properly fenced, and shall destroy or injure the growing crop, or shall break the fence, or commit other waste or damage, the owner thereof shall pay to the landowner the full amount of such damage or loss.  But if

---

[25]    Prior to 1888, the civil code contained one provision addressing trespass onto any cultivated land (§ 239) and one provision addressing trespass onto any uncultivated land (§ 240).  1884 Civ. Code §§ 239, 240, at 55-56.  A third provision doubled the penalties in sections 239 and 240 when the land was "enclosed by a lawful fence."  Id. § 242, at 57.

> the trespass shall be committed on cultivated ground which is not enclosed by a legal fence, the owner of the animal or animals shall pay to the owner of the land the sum of two dollars for each animal trespassing, excepting sheep and goats for which he shall pay twenty-five cents each; provided however, that if in any particular case this provision shall have an onerous or unjust bearing, owing to the large number of animals trespassing, the Judge shall have power to diminish the forfeiture.

An Act to Amend and Consolidate the Law Relating to Pounds, Estrays, Brands and Marks, Bill No. 27 § 9, at 5-6, in 1888 Bills & Laws, #1-77, Box 89 (manuscript) (emphases added) [hereinafter Bill No. 27] (on file with the Hawai'i State Archives).

Bill No. 27 specified only two types of cultivated land: "properly fenced" cultivated land, and cultivated land "not enclosed by a legal fence." This categorization is made clear by the sentence beginning with "But if" in Bill No. 27 that distinguished between trespass onto "properly fenced" cultivated land and trespass onto "cultivated" land that was "not enclosed by a legal fence." The term "properly fenced" thus referred to land that was "enclosed by a legal fence."

This original version of the bill draft, which is preserved in the Hawai'i State Archives, has a handwritten notation in the bill's margin next to the sentence beginning with "But if." The notation states "Sec 10," indicating that this portion of the provision was to be placed into its own section. Bill No. 27 § 9, at 5. When this division was

incorporated in section 10 in a subsequent draft, a wording
change was made:

"*cultivated ground which is not enclosed by a legal fence,*"

was rephrased as

"*any unfenced cultivated ground.*"

Sections 9 and 10 accordingly appear as follows in the 1888 Act:

> SECTION 9.  If any cattle, horse, mule, ass, swine, sheep
> or goat, <u>shall trespass on any properly fenced, cultivated
> ground</u>, the owner thereof shall pay to the owner of such
> land the full amount of the damage or loss occasioned by
> such estray to such land-owner, and the sum of fifty cents
> for each animal trespassing, excepting sheep and goats, for
> which he shall pay ten cents each[.]

> SECTION 10.  If any animals mentioned in Section 9 of this
> Act <u>shall trespass upon any unfenced, cultivated ground</u>,
> the owner thereof shall pay to the owner of such land the
> sum of twenty-five cents for each animal trespassing,
> excepting for sheep and goats, for which he shall pay ten
> cents each.  The owner of such lands shall not be entitled
> to claim any damages for such trespass other than said sum
> of twenty-five cents[.]

1888 Sess. Laws §§ 9, 10, at 77-78 (emphases added).[26]

While it would appear that the change in wording that
occurred when section 9 was divided into two sections was
intended to be stylistic only,[27] the literal wording of section

---

[26]    There are three undated drafts in the file containing the drafts
of Bill No. 27.  The first is a manuscript and appears to be the original
bill draft introduced in the 1888 session.  The other two drafts include the
division of section 9 into sections 9 and 10 as discussed.  File No. 222-89-
2, in 1888 Bills & Laws, #1-77, Box 89 (on file with the Hawai'i State
Archives).

[27]    This is evident, for example, from the similarity of section 10's
language to section 11 of the 1888 Act.

> SECTION 10.  <u>If any animals mentioned in Section 9 of this
> Act shall trespass upon any unfenced, cultivated ground,
> the owner thereof shall pay to the owner of such land</u>
> . . . .

(continued . . .)

26

10 could be read in isolation to mean "no fence" rather than land "not enclosed by a legal fence." This reading of section 10 would exclude all cultivated land with a fence that did not meet the requirements of a legal fence ("not-properly fenced") from any statutory protection against trespassing livestock, in stark contrast to the purpose and text of the original draft of Bill No. 27 and its subsequent singularly stated objective to recodify section 9 into two sections. The significant effect of abruptly excluding not-properly fenced, cultivated land from all statutory protection against trespassing livestock raises the question of whether the drafters' use of the term "unfenced" was intended to depart from the liability scheme that had historically been a part of the livestock statutes.

It is well established that statutes in pari materia should be construed together. Wells Fargo Bank, N.A. v. Omiya, 142 Hawai'i 439, 450, 420 P.3d 370, 381 (2018) (quoting State v. Kamana'o, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008)). In construing each individual part of a statute, the court must consider the statute as a whole to ensure that all parts produce

---

(. . . continued)

> SECTION 11. If any of the animals mentioned in Section 9 of this Act shall trespass on any uncultivated land the owner of such animals or animals shall pay to the owner of the land . . . .

1888 Sess. Laws §§ 10, 11, at 77-78 (emphases added).

a sensible and harmonious whole.  Kauai Springs, Inc. v.

Planning Comm'n of Cty. of Kauaʻi, 133 Hawaiʻi 141, 163, 324 P.3d

951, 973 (2014); State v. Davis, 63 Haw. 191, 196, 624 P.2d 376,

380 (1981).

Under the 1888 Act, a livestock owner whose cattle

trespassed on "any unfenced, cultivated" land or on "any

uncultivated" land was required to pay to the owner of the land

the sum of twenty-five cents per trespassing animal.  1888 Sess.

Laws §§ 10, 11, at 77-78.[28]  If section 10 only applied to

cultivated land that was wholly unfenced, then the statute would

protect not-properly fenced, uncultivated land to a greater

degree than not-properly fenced, cultivated land.  This is

because the owner of not-properly fenced, uncultivated land

could recover a set sum for the trespass of each animal under

section 11 of the 1888 Act, while the owner of not-properly

fenced, cultivated land could not recover under section 10.

Stated differently, a livestock owner would only be required to

pay the statutory amount for trespass to a crop owner of not-

---

[28]     Section 11 of the 1888 Act provides as follows:

> SECTION 11.  If any of the animals mentioned in Section 9
> of this Act shall trespass on any uncultivated land the
> owner of such animal or animals shall pay to the owner of
> the land the sum of twenty-five cents for the trespass of
> each animal, excepting for sheep and goats, for which he
> shall pay ten cents each, and if any damage be done by the
> animal or animals, the owner thereof shall further pay to
> the land-owner the full amount of such damage.

1888 Sess. Laws § 11, at 78 (emphasis added).

properly fenced land when the crop owner was not growing crops. In effect, the statute as a whole would penalize a land owner for cultivating the land by depriving the crop owner of an ability to recover the set statutory amount for a trespassing animal.

Similarly, an owner of cultivated land who sought to protect crops with a fence that inadvertently did not fully meet the requirements of a lawful fence could not recover the statutory amount. In contrast, an owner of cultivated land who made no attempt to protect crops with a fence could recover a set sum for the trespass of each animal under section 10. The statute would consequently have the effect of penalizing the crop owner who unsuccessfully attempted to qualify for the increased protection offered by section 9 of the statute, compared to crop owners who did not take steps to protect their crops. Thus, reading section 10 to apply only to wholly unfenced, cultivated land produces an inharmonious reading of the 1888 Act as a whole. See Kauai Springs, Inc., 133 Hawaiʻi at 163, 324 P.3d at 973.

Additionally, principles of statutory interpretation instruct that a statute must be read to give effect to all the sentences, clauses, and words in the statute. Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 18, 346 P.3d 70, 87 (2015).

Under the 1888 Act, before a person could impound trespassing animals, the person was required to provide a statement that included the amount of damages and expenses claimed.  1888 Sess. Laws § 4, at 75.[29]  These expenses included the actual expenses incurred in capturing and conveying the trespassing animal to the pound in all cases and were required to "be added to the forfeits and damages specified in [sections 9, 10, and 11]."  Id. § 13, at 78 (emphasis added).[30]  If section 10 applied only to wholly unfenced, cultivated land, this portion of section 13 would be superfluous when trespass occurred onto not-properly fenced, cultivated land, a result that would be in conflict with giving effect to all clauses in a

---

[29]    Section 4 of the 1888 Act provided as follows:

SECTION 4.  No Pound Master shall receive estrays until the person wishing to impound the same, shall have signed his name to a statement setting forth the number and species of estrays, locality trespassed upon, name of owner or owners of such estrays, if known, together with the date on which they were taken and the amount of damages and expenses claimed. . . .

1888 Sess. Laws § 4, at 75.

[30]    Section 13 of the 1888 Act provided as follows:

SECTION 13.  In all cases where animals are taken up for trespass, the actual expenses incurred, or a fair allowance for the labor required in catching, driving and conveying such animals to the pound, and of giving notice to the owner of the same, shall be added to the forfeits and damages specified in the preceding sections.  Provided however, that the charge for such catching, driving and conveying to the pound shall not exceed one dollar per head.

1888 Sess. Laws § 13, at 78 (emphases added).

30

statute.  See Coon v. City & Cty. of Honolulu, 98 Hawaiʻi 233, 250, 47 P.3d 348, 365 (2002) (rules of statutory construction require rejection of an interpretation that renders any part of the statutory language a nullity).  Similarly, section 14 applies when "any animals are taken up for trespass" without limitation as to whether the land is cultivated or uncultivated.[31]  The section provides that livestock owners shall be notified, if known, of "the amount of damage and trespass fees claimed" when any trespassing animals are caught.  1888 Sess. Laws § 14, at 789.  If the "legal charges" (set forth in sections 9, 10, and 11 of the 1888 Act) were not paid, the land owner could impound the animals.  Id.  Again, if section 10 did not apply to not-properly fenced, cultivated land, the "legal charges" and impoundment clauses would be nullities despite section 14 ostensibly applying "[w]hen any animal or animals are taken up for trespass."  See Miyagawa v. Ferreira, 10 Haw. 23, 23 (Haw. Rep. 1895) (making no distinction as to whether the

---

[31]    Section 14 of the 1888 Act provides as follows:

SECTION 14.  When any animal or animals are taken up for trespass, the owner, if known, shall be immediately notified, if reasonably practicable, of such fact, and of the amount of damage and trespass fees claimed, and if he shall refuse or fail to pay the legal charges, or in case the owner be unknown, then the animal or animals shall be impounded forthwith.

1888 Sess. Laws § 14, at 79 (emphasis added).

trespassed land was fenced or not in recognizing that a "person whose land has been trespassed on and crops damaged" has a remedy under section 14 of the "impounding law" of 1888). Reading "unfenced" to include all cultivated land not included in section 9 gives full effect to all parts of sections 13 and 14 in the 1888 Act.

We have also frequently stated that statutes should be interpreted according to the intent, meaning, and purpose of the overall statutory scheme and not in a manner that would lead to absurd and unjust results. Allstate Ins. Co. v. Hirose, 77 Hawai'i 362, 371, 884 P.2d 1138, 1147 (1994); see also Kim v. Contractors License Bd., 86 Hawai'i 264, 269-70, 965 P.2d 806, 811-12 (1998); Richardson v. City & Cty. of Honolulu, 76 Hawai'i 46, 60, 868 P.2d 1193, 1207 (1994). When a literal interpretation of a statute would lead to absurd or unjust results, the court may depart from its plain reading. Franks v. City & Cty. of Honolulu, 74 Haw. 328, 341, 843 P.2d 668, 674 (1993).

Beginning in 1856, the definition of "lawful fence" in the livestock statutes functioned to distinguish between cultivated land "enclosed by a lawful fence" and all other cultivated land in order to determine the amount of statutory damages a livestock owner was required to "forfeit and pay" to

the aggrieved land owner.  See 1856 Sess. Laws §§ 8, 9, at 51. The original draft of Bill No. 27 did not change the function of the "lawful fence" provision, and like the prior law, the 1888 Act envisioned only two types of cultivated land: cultivated land enclosed by a lawful fence and all other cultivated land.

Assuming arguendo that "unfenced" meant "no fence," the 1888 Act would have, for the first time, created three categories of fences: lawful fences, no fences, and everything else in between (e.g., partial fences, not-properly built fences).  But dividing fences into three groups would result in irrational and illogical consequences to crop owners in light of the definition of lawful fence.

First, to be properly fenced, fenced land must be capable of preventing the trespass of livestock.

> SECTION 15.  Every fence shall be deemed a lawful fence which shall be . . . substantially built, strong and close, to turn all stock excepting swine, and in good repair.  The sea, rivers, ponds and natural perpendicular bluffs, whenever impassable, shall be legal fences.

1888 Sess. Laws § 15, at 79 (emphasis added).  To satisfy this requirement, land would have to be enclosed by a fence or have an impassable barrier on all four sides.  Any crop owner whose unfenced property was bordered by a neighbor's fenced property on less than all sides would thereby have partially fenced property, and such land would be excluded from statutory protection under the 1888 Act if "unfenced" meant "no fence"

33

because the land would neither be "properly fenced" or "unfenced." This would force the crop owner to completely enclose their property with a proper fence or to persuade the neighbor to dismantle the fence in order to receive the statute's protection. This situation would be further complicated if the fence on the adjoining property was improperly built or fell into disrepair because a crop owner would be required to have the fence fixed to obtain statutory protection from trespassing livestock.

Similarly, because the definition of lawful fence included "impassable" rivers, ponds, and bluffs, any cultivated land with such a natural barrier would result in the property being partially fenced unless the barrier completely enclosed the property. In such a situation, the cultivated land would not be considered to have "no fence," and the landowner would not be entitled to compensation when livestock trespass occurred unless the remainder of the property was properly fenced. A crop owner with an impassable barrier on the property would therefore be required to undertake the time and expense to properly enclose the land with a lawful fence or lose protection under the statute. The 1888 Act would thus shift responsibility for preventing a trespass from livestock owners to crop owners when circumstances beyond the crop owner's control rendered their property not properly fenced.

Finally, in order to receive protection under the 1888 Act, the owner of fenced cultivated land would be required to show that the fence was (1) made of "suitable materials," (2) not less than 4½ feet in height, (3) "substantially built," (4) "strong and close, to turn all stock," and (5) in good repair. 1888 Sess. Laws § 15, at 79. However, a landowner would encounter extreme difficulty (absent intentional damage to the fence) in proving a fence was "substantially built, strong and close, to turn all stock" in light of the fact that the claim for damages would have had to result from a trespass. If section 10 provided statutory protection only to cultivated land with no fencing, a landowner would risk losing all protection under the statute by choosing to erect a fence. This would have the absurd effect of disincentivizing fencing on cultivated land because a landowner with no fence could always recover for trespass under section 10, but the owner of fenced cultivated land would always have to prove the land was "properly fenced" pursuant to section 9.

Interpreting "unfenced" to mean "no fence" thus leads to unjust and absurd results.[32] Rather, it is apparent that the

---

[32] It is unsurprising that the legislative history for the 1888 law provides no report or explanation for the change of wording in section 10, particularly one indicating an intent to depart from the established liability scheme. See File No. 222-89-2, in 1888 Bills & Laws, #1-77, Box 89 (on file with the Hawaiʻi State Archives).

1888 Act's drafters intended sections 9 and 10 to be construed together such that livestock owners would continue to be liable for trespass onto all cultivated land as the prior livestock laws had provided. Reading "unfenced" to include all land not enclosed by a lawful fence also maintains the appropriate function of the "lawful fence" provision and is consistent with the intent, meaning, and purpose of the overall statutory scheme as evidenced by the legislative history of the prior livestock statutes.

Accordingly, review of the previous legislative history of the livestock statutes and the application of principles of statutory construction plainly manifest that the phrase "any unfenced, cultivated land" was not intended to exclude all cultivated property not enclosed by a lawful fence from statutory protection against trespassing livestock.[33] The word "unfenced" in section 10 of the 1888 Act must therefore be read as including cultivated land not enclosed by a lawful fence.

---

[33] Sections 9 and 10 were recodified into the territorial laws of Hawai'i in 1907, and incorporated into the Revised Laws in 1925, 1935, 1945, and 1955. Laws of the Territory of Hawai'i, 1907 Sess. Laws Act 125, §§ 12, 13 at 290-91; Revised Laws of Hawai'i (RLH) §§ 700, 701 (1925); RLH §§ 278, 279 (1935); RLH §§ 1084, 1085 (1945); RLH §§ 20-62, 20-63 (1955).

### c. 1975 Amendments

The provisions in the 1888 Act addressing trespass onto cultivated land remained substantively unchanged until 1975. In 1975, HRS §§ 142-63 and 142-64 were amended to their current form, which permit landowners to recover "the full amount of the damage or loss" from trespassing livestock regardless of whether the property is "fenced" or "unfenced."[34] See 1975 Haw. Sess. Laws Act 40, § 1 at 69. These amendments effectively eliminated any distinction between fenced and unfenced cultivated land, thereby treating trespass onto all cultivated land the same. Further, the intended purpose of these amendments indicates an understanding by the legislature that not-properly fenced, cultivated land would be covered under the statutory scheme. The purpose of the amendments was explained by both a House and Senate report. The House Report provided the following:

---

[34]    As stated, HRS §§ 142-63 and 142-64 provide as follows:

§142-63 Trespass on fenced cultivated land. If any cattle, horse, mule, ass, swine, sheep, or goat, trespasses on any properly fenced cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowners, or to any person in possession of the land, whoever suffers the damage or loss.

§142-64 On unfenced cultivated land. If any of the animals mentioned in section 142-63 trespasses on any unfenced cultivated ground, the owner thereof shall pay upon proof, the full amount of the damage or loss to the landowner or to any person in possession of the land, whoever suffers the damage or loss.

37

> The purpose of this bill is to modify the liability of livestock owners for trespass of their animals upon land.
>
> The bill would amend the present law by making the owner of livestock liable for all proven damages or losses for the trespass of his animals.
>
> Presently, the land owner can recover for property damage only if the land is fenced. He is also entitled to a specific monetary amount for each head of trespassing livestock, at the discretion of the court.
>
> Owners of unfenced cultivated land can recover only a specific monetary amount for each head of trespassing livestock, also at the discretion of the court.
>
> This bill would simplify the determination of damages in all animal trespass cases.

H. Stand. Comm. Rep. No. 428, in 1975 House Journal, at 1149 (emphasis added). Similarly, the Senate Report explained the following purpose of the Act:

> The purpose of this bill is to modify the liability of livestock owners for trespass of their animals upon fenced or unfenced cultivated land as well as fenced uncultivated land. Also, the bill simplifies the determination of damages in all animal trespass cases.
>
> The deletion of material concerning penalties "per head[,"] with varying amounts depending on what kind of animal trespassed, is appropriate. The present law originated in a predominantly agricultural era and as such, has little justification today on a "per head" basis. Requiring the livestock owner to bear the full cost of damages or loss to the land owner, upon proof of such, is more in line with present conditions.
>
> Your Committee has amended the bill to provide that not only the landowner, but any person in possession of the land who suffers loss or damage would be compensated. This would include lessees, tenants, purchasers under an agreement of sale or any other person in possession of the land.

S. Stand. Comm. Rep. No. 823, in 1975 Senate Journal, at 1143 (emphases added).

These committee reports demonstrate that the legislature viewed cultivated land as being either fenced or unfenced and intended to "mak[e] the owner of livestock liable for all proven damages or losses for the trespass of his animals" in either event. H. Stand. Comm. Rep. No. 428, at 1149. That is, regardless of the status or quality of the fence, "in all animal trespass cases" livestock owners became liable for "the full cost of damages or loss to the land." S. Stand. Comm. Rep. No. 823, at 1143. This simplified the determination of damages because the trier of fact was previously required to make fact-intensive determinations as to whether a property was "properly fenced" based on whether the fence was (1) "substantially built," (2) "strong and close," (3) "existing in [a] good state," and (4) "capable of turning [away] all stock . . . attempting to pass through the fence." HRS § 142-61.

Additionally, in such cases, the burden would presumably be placed upon the crop owner to prove these requirements, and a failure to satisfy any of the requirements would result in a determination that the property was not "properly fenced." As explained supra, this would place a crop owner in the position of having to prove that the land trespassed upon was "properly fenced" with a fence "capable of turning . . . all stock . . . attempting to pass through the

39

fence," which would almost always be disproved by the fact that the livestock was able to circumvent the fence.

But after the 1975 amendments, a court or jury was no longer required to make this complicated factual determination when deciding the amount of damages to award under Chapter 142. Instead, the 1975 amendments "simplified" the liability scheme "in all animal trespass cases" by making a livestock owner liable for the full amount of damages caused by the owner's trespassing animals on cultivated land.[35] And rather than repeal sections 142-63 and 142-64 and enact a new statute, the legislature simply embedded the new liability scheme into the pre-existing statutory language.

However, the legislative intent to simplify the determination of damages would not have been achieved unless HRS § 142-64 applied to all cultivated land not properly fenced. This is because the trier of fact would still be required to make this complicated factual determination in cases that involved trespass onto any fenced, cultivated land to assess the applicability of HRS § 142-63. The amendments also would not

---

[35] In 1975, the legislature also amended the statutes "to provide that not only the landowner, but any person in possession of the land who suffers loss or damage would be compensated." S. Stand. Comm. Rep. No. 823, at 1143. It is noted that, as a practical matter, tenants and lessees may not be in a position to fence property as it may be cost prohibitive or difficult to complete within the time frame of the lease. The tenant thus may have little control over the fencing whereas the owner of livestock presumably would have control over the animals.

have accomplished the stated purpose of "making the owner of livestock liable for all proven damages or losses for the trespass of his animals" because a livestock owner would evade liability in cases involving trespass onto not-properly fenced cultivated land.

The history of sections 142-63 and 142-64 thus manifests an understanding by the legislature in 1975 that these sections would make a livestock owner liable for the "full cost of damages" to "any [] person in possession" of the cultivated land.  And it is clear that the legislature intended to impose liability upon livestock owners for livestock damage to any cultivated land, regardless of the existence or condition of a fence "in all animal trespass cases."  H. Stand. Comm. Rep. No. 428, at 1149; S. Stand. Comm. Rep. No. 823, at 1143.  The ICA was therefore incorrect in determining that the Aguiars were not responsible for the damages that their livestock caused to Yin's crops because his leased property was neither "properly fenced" nor "unfenced."

**B. The Exculpatory Lease Provision Is Contrary to Statutory Law and Public Policy.**

Yin argues that HRS §§ 142-63 and 142-64 demonstrate a public policy that "any person suffering crop damage caused by trespassing livestock is entitled to compensation."  And because

the lease provision exculpating the Aguiars violated these statutes, Yin contends, the provision is void.[36]

Generally, a party "who assents to a contract is bound by it." Courbat v. Dahana Ranch, Inc., 111 Hawaiʻi 254, 264, 141 P.3d 427, 437 (2006) (quoting Leong v. Kaiser Found. Hosps., 71 Haw. 240, 245, 788 P.2d 164, 168 (1990)). Under this basic principle, parties "are permitted to make exculpatory contracts so long as they are knowingly and willingly made and free from fraud." Id. (quoting Fujimoto v. Au, 95 Hawaiʻi 116, 156, 19 P.3d 699, 739 (2001)). However, exculpatory clauses "are not favored" and, "if possible," will be "construed not to confer this immunity." Fujimoto, 95 Hawaiʻi at 155, 19 P.3d at 738 (citing 15 Williston on Contracts § 1750A, at 144-45 (3d ed. 1972)). Exculpatory provisions are disfavored because "they tend to allow conduct below the acceptable standard of care." Id. at 155, 19 P.3d at 738 (quoting Yauger v. Skiing Enters., Inc., 557 N.W.2d 60, 62 (Wisc. 1996)); see also Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship, 115 Hawaiʻi 201, 224, 166 P.3d 961, 984 (2007) ("[T]he law of torts imposes standards of conduct for the protection of others against unreasonable

---

[36] The ICA does not appear to have addressed whether the exculpatory lease provision violated a public policy established by HRS § 142-63 or HRS § 142-64 because it found that neither statute applied. Because we find that the statutes impose liability on a livestock owner for trespass damage to cultivated land, we consider whether the circuit court erred in concluding that the lease provision was not void against public policy.

risk of harm and one cannot exempt himself from such liability for harm that is caused either intentionally or recklessly." (internal quotation marks and alterations omitted)).

When evaluating the validity of such clauses, we "examine[] whether [they] violate public policy." Fujimoto, 95 Hawai'i at 156, 19 P.3d at 739; see also 15 Grace McLane Giesel, Corbin on Contracts § 79.1, at 1 (2003) ("The law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced . . . if found to be contrary to public policy."). Public policy, generally, is a "principle of law which declares that no one may lawfully do that which has a tendency to be injurious to the public welfare." McClure Eng'g Assocs., Inc. v. Reuben H. Donnelley Corp., 447 N.E.2d 400, 402 (Ill. 1983). Public policy may therefore derive from numerous sources including constitutional provisions, statutory provisions, or the common law. 2 Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 21:5, at 481 (2d ed. 2019); Giesel, supra, § 79.2, at 5. This court has specifically identified three situations when an exculpatory provision is void as against public policy: (1) if the provision is "violative of a statute," (2) if it is "contrary to a substantial public interest," or (3) if the provision was "gained through inequality of bargaining power." Fujimoto, 95 Hawai'i at 156, 19 P.3d at 739 (citing

Andrews v. Fitzgerald, 823 F.Supp. 356, 378 (M.D.N.C. 1993));
see also Inlandboatmen's Union v. Sause Bros., Inc., 77 Hawai'i
187, 194, 881 P.2d 1255, 1262 (App. 1994) ("[A] court may refuse
to enforce contracts that violate law or public policy.").

In Bowers v. Alamo Rent-A-Car, Inc., we addressed an
"escape clause," which is akin to an exculpatory clause, that
attempted to alter the liability scheme established by a
statute.  88 Hawai'i 274, 275, 965 P.2d 1274, 1275 (1998).  In
that case, the renter of a motor vehicle had a car insurance
policy with State Farm Mutual Automobile Insurance Company that
provided that if the renter drove a car that the renter did not
own that "ha[d] other vehicle liability coverage on it," then
the State Farm policy would constitute excess coverage.  Id.
The renter rented a car from Alamo Rent-a-car, Inc., and the
rental agreement stated that "[i]f there is no other valid and
collectible insurance, whether primary, excess, or contingent,
available to the renter . . . then Alamo's vehicle liability
policy shall pay damages not to exceed minimum limits required
by applicable law."  Id.  In essence, the rental provision
attempted to shift the responsibility to provide liability
insurance from Alamo to State Farm.  Id. at 278, 965 P.2d at
1278.  After being involved in an automobile accident with the
rental car, the renter brought an indemnification suit against

44

Alamo, and Alamo denied that it had a duty to insure the renter.
Id. at 275, 965 P.2d at 1275.

At the time that the litigation commenced, a Hawai'i statute provided that "[e]very owner of a motor vehicle used or operated at any time upon any public street, road, or highway of this State shall obtain a no-fault policy upon such vehicle . . . and shall maintain the no-fault policy at all times for the entire motor vehicle registration period." Id. at 277, 965 P.2d at 1277 (quoting HRS § 431:10C-104(b) (1993)). We explained that the statute placed "the primary obligation to provide minimum coverage for the owned vehicle" on "the owner of [the] vehicle," which was Alamo. Id. For Alamo to escape liability, this court stated, the escape clause would have to be construed as "providing no vehicle liability coverage" because the basis of minimum coverage would be the State Farm policy's excess coverage provision. Id. at 277-78, 965 P.2d at 1277-78. Because the statute mandated that "[t]he owner of the automobile [was] responsible for providing coverage," the Bowers court held that the escape clause violated public policy by "contractually shifting responsibility [for providing liability coverage] to the [renter]'s insurance company." Id. at 279, 965 P.2d at 1279.

For more than 175 years, Hawai'i law has held livestock owners liable under specified circumstances for the damages

45

caused by their trespassing livestock, with the law in Hawai'i providing greater statutory protections to cultivated land as time passed. See supra Part IV.A.2. These protections were broadened in 1975 when the legislature "modif[ied]" the liability imposed by HRS Chapter 142 to "[r]equire the livestock owner to bear the full cost of damages or loss to the land owner" or "any person in possession of the land," which was "more in line with present conditions." S. Stand. Comm. Rep. No. 823, at 1143. This established history of imposing liability on the livestock owners for their trespassing animals and providing greater statutory protections to cultivated land demonstrates a public policy in HRS Chapter 142 for holding livestock owners responsible for damages caused by their livestock.

Here, the exculpatory provision in Yin's lease stated that he was "fully responsible" for "keeping cattle[] out of [his] crops." On its face, this provision broadly exculpates the Aguiars from all damage to Yin's land that resulted from their trespassing cattle. Even if Yin's property was "unfenced," this clause would exculpate the Aguiars. The same would be true if Yin's property was "properly fenced." Similar to the escape clause in Bowers, the exculpatory clause in Yin's lease has the effect of exculpating a party from liability that is statutorily bound to pay damages. This directly contradicts

46

HRS §§ 142-63 and 142-64, which, as explained, provide that livestock owners are liable for the damage caused by their trespassing animals onto cultivated land regardless of whether a property is "properly fenced" or "unfenced."  Not only is this liability codified in Hawaiʻi's statutes, but it is also a basic principle of common law.[37]  Because the exculpatory clause is violative of Hawaiʻi's statutory law, it violates public policy. Fujimoto, 95 Hawaiʻi at 156, 158, 19 P.3d at 739, 741 (holding that "the statute must take precedence over the terms of the contract" where an exculpatory clause was in direct conflict with a statute).  Thus, the clause is unenforceable and does not exculpate the Aguiars from liability arising from the damage to Yin's sweet potatoes caused by their cattle.  The circuit court accordingly erred in concluding that the exculpatory lease provision did not violate public policy, and the ICA also erred

---

[37]     Under both the English and American common law, the owner of cattle or livestock was liable for the damage done by trespassing animals. See Studwell v. Ritch, 14 Conn. 292, 292 (1841) (stating that under English common law it was "the duty of the owner of cattle to restrain them" and the owner was "generally liable in damages" for trespass upon the land of another person); 7 Stuart M. Speiser et al., Am. Law of Torts § 21:33 (2018) ("Generally, a possessor of livestock . . . is strictly liable for damages resulting from the animal's trespasses."); 4 Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 36:14 (2d ed. 2018) ("Liability for damage caused by trespassing animals is absolute.").  Pursuant to HRS § 1-1 (2009), "The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii . . . ., except as otherwise expressly provided by" federal or State law.

in concluding that it was Yin's duty to "keep the cows off his property."[38]

## V. CONCLUSION

Based on the foregoing, we vacate the ICA's Judgment on Appeal and the circuit court's March 27, 2015 Order Granting Defendants Virginio Aguiar, Kevin Aguiar, and Agee, Inc.'s Motion for Summary Judgment As to All Claims Filed December 24, 2014 and its July 1, 2015 Judgment in Favor of Defendants Virginio Aguiar, Kevin Aguiar and Agee, Inc. and Against Plaintiff Jijun Yin.[39]  This case is remanded to the circuit court for proceedings consistent with this opinion.

Gary C. Zamber
for petitioner

Sidney K. Ayabe
Gary S. Miyamoto
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



---

[38]    As noted, infra note 13, the ICA held that the Aguiars met their burden of producing evidence that they were intended beneficiaries of the lease.  We need not address this aspect of the ICA's ruling as the exculpatory provision violated public policy, regardless of whether the Aguiars were its intended beneficiaries.

[39]    Based on our disposition herein, the circuit court's June 9, 2015 Order Granting in Part and Denying in Part Defendants Virginio Aguiar, Jr., Kevin Aguiar, and Agee, Inc.'s Motion for an Award of Attorneys' Fees and the Taxation of Costs Filed March 27, 2015, is also vacated as the Aguiars' status as a prevailing party under HAR Rule 25 relies upon the circuit court's grant of summary judgment.